### ETHEREDGE v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. April 11, 1911.)

No. 2,065.

1. INDICTMENT AND INFORMATION (§ 130*)—COUNTS—DIFFERENT OFFENSES—JOINDER.

The statute limiting the number of counts which may be joined in the same indictment for separate offenses committed within the same six calendar months relates merely to the mode of procedure, so that the inclusion of more than three counts in the same indictment does not vitiate it as an entirety; the rights of the defendant ordinarily being amply safeguarded by directing the prosecution before entering on the trial to nolle pros. all the counts in excess of three, or by requiring the prosecutor to elect three of the counts on which he will proceed after his evidence is in, and then compel him to abandon the others.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 419–423; Dec. Dig. § 130.*]

2. POST OFFICE (§ 48*)—MISUSE OF MAILS—"SCHEME TO DEFRAUD"—INDICTMENT.

An indictment for violating Rev. St. § 5480, as amended by Act Cong. March 2, 1889, c. 393, § 1, 25 Stat. 873 (U. S. Comp. St. 1901, p. 3696), prohibiting the use of the United States mails in furtherance of a "scheme or artifice to defraud," must allege, not only that the defendant had devised a scheme or artifice to defraud, but must also plead facts showing what the artifice was, wherein the fraud consisted, and how it was to be accomplished, the words "scheme or artifice" not being equivalent to a plan or mode of effecting a fraud, but must be a plan so cunningly devised and presented as to appeal to human passion for gain, by untruthful and seductive embellishment of advantages, begetting confidence where it would not otherwise be bestowed; and hence.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

an indictment merely charging that defendant caused another to order a diamond ring from complainant to be paid for on the installment plan, through the United States mails, with the intent not to pay for the same, did not charge a scheme to defraud, and was therefore insufficient.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 48.*

For other definitions, see Words and Phrases, vol. 7, p. 6342.

Nonmailable matter, see note to Timmons v. United States, 30 C. C. A. 79.]

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Alabama.

John B. Etheredge was convicted of using the post office establishment in furtherance of a scheme to defraud, and he brings error. Reversed and remanded, with instructions.

This is a writ of error sued out by John B. Etheredge to reverse his conviction under an indictment charging him with the violation of section 5480 of the Revised Statutes, as amended by the act of March 2, 1889 (U. S. Comp. St. 1901, p. 3696). The indictment contains four counts, differing from one another in that three of them aver a scheme to defraud Loftis Bros. & Co., a corporation, and the other, a scheme to defraud Loftis Bros. & Co., a partnership. Each of the counts sets forth a letter averred to have been mailed in execution of the scheme, three of them reciting the same letter, and the fourth a different letter. It is necessary to proper understanding of the case to set forth only one of the counts. The first count of the indictment reads as follows: "The grand jurors of the United States elected, impaneled, sworn, and charged to inquire for the body of the said Northern division of the Northern district of Alabama, upon their oaths present that on, to wit, the 27th day of April, A. D. 1908, at Town Creek, in the county of Lawrence, state of Alabama, and in the division and district aforesaid, John B. Etheredge had then and there devised a scheme and artifice to defraud Loftis Brothers & Company, of Chicago, Illinois, a corporation, to be effected by opening correspondence and communication with the said Loftis Brothers and Company by means of the post office establishment of the United States, which scheme was in substance and effect following, to wit: That one Claude Le May would order of the said Loftis Brothers and Company a diamond ring of great value to be sent to the said Claude Le May, to be paid for in installments, with the intent then and there entertained by the said Claude Le May, and the said John B. Etheredge not to pay for said ring, but to convert the same to the use of the said Claude Le May and John B. Etheredge, without paying for the same, and that the use of the post office establishment was a part of said scheme and artifice to defraud and that the said John B. Etheredge in and for executing said scheme and artifice did on the 27th day of April, A. D. 1908, place and cause to be placed in the post office of the United States at Town Creek, Alabama, a letter with the intent and purpose that said letter should be sent and delivered by the said post office establishment to the said Loftis Brothers and Company, at Chicago, Illinois, which said letter was in substance as follows: 'Town Creek, Ala., 4/27/1908. Loftis Bros. & Co., Chicago, Ill.—Gentlemen: Enclosed find check for $30.00, for which send me No. 8713 $200.00 diamond ring, size 7-½, by mail. I enclose reference from the house I work for. Yours truly, Claude Le May'—contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States."

The defendant demurred to the indictment and each count thereof on the following grounds: "(1) Said indictment charges the defendant, John B. Etheredge, with more than three separate and distinct offenses committed within the same six months. (2) Said indictment contains four separate counts, each of which charge the defendant with separate and distinct violations of section 5480 by mailing the four separate letters, all within the same six months. (3) Said indictment does not show that the defendant had devised

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a scheme and artifice to defraud Loftis Bros., of Chicago, by opening correspondence with the said Loftis Bros. by means of the post office establishment of the United States. (4) Said indictment does not· show that the said defendant made to Loftis Bros. any false representation or pretense for the purpose of procuring said diamond ring.. (5) Said indictment does not describe a scheme and artifice to defraud Loftis Bros. by means of opening correspondence and communication with them by means of the post office establishment of the United States, in this: That it does not show that the said John B. Etheredge as a part of said scheme ·intended to represent any false matters to said Loftis Bros.; or that he intended to make them any false pretense, or token, for the purpose of procuring from them said diamond ring. (6) Said indictment does not show that the said John B. Etheredge, defendant, made any false representations to the said Loftis Bros. for the purpose of obtaining said diamond ring, or that he intended, as a part of said scheme, to make any such false pretense for the purpose of obtaining the same. (7) There is no charge in said indictment that the said defendant intended as a part of the scheme and artifice set forth therein to make any false representations to Loftis Bros. or any other person for the purpose of procuring said diamond ring, or that he as a matter of fact did make, either through correspondence or otherwise, any false representation for the purpose aforesaid. (8) Said· indictment charges no offense under the laws of the United ·States."

The demurrer was overruled, whereupon the defendant pleaded not guilty, a trial was had, the jury returning a verdict of guilty as to the first, third, and fourth counts of the indictment, and the defendant was thereupon sentenced to be confined in the penitentiary for 18 months and to pay. a fine of $500.

Shelby S. Pleasants, for plaintiff in error.

O. D. Street, U. S. Atty.

Before PARDEE, Circuit Judge, and TOULMIN and JONES, District Judges.

JONES, District Judge (after stating the facts as above). This case is not controlled in any way by the Penal Code of 1910. The indictment is found on section 5480 of the Revised Statutes, as amended by the act of March 2, 1889, and charges that the offense was committed on the 27th day of April, .1908.

[1] The provision of the statute regarding the number of. counts which may be joined in the same indictment for separate offenses committed within the same six calendar months relates merely to the mode of procedure. The inclusion of more than three counts in. the same indictment does not vitiate it as an entirety.· Neither the reason nor the letter of the statute requires the court to hold that all good counts in such an indictment are rendered bad merely because the indictment contains counts in excess of the number which the statute permits to be joined in the same indictment. The indictment here contains four counts, three averring a scheme to defraud Loftis Bros., a corporation, and the fourth charging a scheme to defraud Loftis Bros. & Co. a partnership. Each of the counts sets out the same "scheme or artifice" to obtain the same ring by the same persons and the posting of letters in execution of the same scheme. It is doubtful, to say the very least of it, whether more than three counts ·which differ from each other as here only in varying descriptions of the same offense fall within the reason of the rule forbidding the joinder of more than. three distinct offenses in the same indictment. It is not perceived how the mere joinder of more than three offenses could so prejudice the de-

fendant that he ought not to be tried on the indictment at all. If, however, that were made to appear, the court could quash the indictment. Ordinarily all the rights of the defendant will be amply safeguarded by directing the prosecution before entering upon the trial to nol. pros. all the counts in excess of three, or, if the court be of opinion that the several counts are merely varied descriptions of the same offense, it can allow the trial to proceed on the indictment until the prosecutor's evidence manifests an election as to the three counts upon which he will proceed, and then compel him to abandon the other counts. Pointer v. U. S., 151 U. S. 396–493, 14 Sup. Ct. 410, 38 L. Ed. 208. The defendant did not ask the court below to take any of these steps. He demanded in effect that the prosecution of all the charges contained in the indictment be discontinued merely because the indictment joined more than three separate offenses within the same six calendar months. The demurrer to the indictment on that ground was properly overruled.

The remaining grounds of demurrer resolve themselves into the objection that the indictment does not disclose any "scheme or artifice to defraud" within the meaning of the postal laws, and, waiving that, that the indictment does not set forth the facts relating to the offense with sufficient definiteness to fairly apprise the defendant of the nature of the offense preferred against him.

[2] It has been settled by repeated decisions that a good indictment under this statute must allege not only that the defendant had devised a "scheme or artifice to defraud," but it must also set out clearly what the artifice was wherein the fraud consisted, and how it was to be accomplished, and that charging the offense in the language of the statute alone is not sufficient. United States v. Hess, 124 U. S. 486, 8 Sup. Ct. 571, 31 L. Ed. 516; Stokes v. United States, 157 U. S. 187, 15 Sup. Ct. 617, 39 L. Ed. 667. Nothing in a criminal case can be charged by implication, but every fact must be clearly alleged. Carll's Case, 105 U. S. 611, 26 L. Ed. 1135; United States v. Post, 113 Fed. 852. The indictment must show clearly that the person charged has devised or intended to devise a "scheme or artifice to defraud"; that he intended to effect it by opening or intending to open correspondence with some other person through the post office establishment, or by inciting some other person to open communication with him; and that in executing the scheme charged in the indictment the accused has either deposited a letter or packet in the post office or has taken or received one therefrom. As said in Miller v. United States, 133 Fed. 341, 66 C. C. A. 403:

"When one is indicted for a serious offense, the presumption is that he is not guilty, and that he is ignorant of the supposed facts upon which the charge against him is founded. He is unable to procure and present the evidence in his defense—indeed, he is deprived of all reasonable opportunity to defend—unless the indictment clearly discloses all the facts upon which the charge of the commission of the offense is based. It must set forth the facts which the pleader claims constitute the alleged transgression so distinctly, as to advise the accused of the charge which he has to meet, so fully as to give him a fair opportunity to prepare his defense, so particularly as to enable him to avail himself of a conviction or acquittal in defense of another prosecution for the same crime, and so clearly, that the court upon an examination

of the indictment may be able to determine whether or not under the law the facts there stated are sufficient to support a conviction."

The indictment does not set out whether the scheme was that one Claude Le May was to open correspondence or communication with Loftis Bros. by the use of the post office establishment, or whether the defendant was to open such correspondence. It might well be that Claude Le May "would order a ring," and yet that prior correspondence by other persons was intended to be opened with Loftis Bros., as a part of the scheme to pave the way for favorable reception of the order when actually sent by Le May. It is not alleged that pursuant to the scheme Le May opened correspondence with Loftis Bros. and ordered the ring of them with the promise to pay for it by installments or otherwise. It is not even alleged that the communications deposited in the post office mentioned in the several counts were in any wise false. The letter, which it is alleged Le May wrote, and Etheredge placed in the post office, is contradictory of the scheme alleged in the indictment that Le May would order a diamond ring to be paid for in installments, in that the letter ordered a diamond ring and inclosed a check for $30, and says nothing about future payments. In its last analysis, the indictment charges nothing more than the mailing of a letter by one person which was written by another person with the understanding that the ring ordered would not be paid for, but converted to their joint use. It is not alleged that it was any part of the understanding between them that the order would be preceded by other letters to influence in any way the judgment of the person to whom the order was addressed, or that it was to be followed by other letters, making any misrepresentation or false statement as to the solvency, character, or occupation of the sender of the order, or otherwise, to get the order filled. It is not alleged that the letter actually sent contained any false statements of any kind, or that it made any promise whatever. The plan described in the indictment really shows nothing more than the mailing of a letter with a fraudulent intent. The averment of such intent, indeed, is essential, but it takes something more than the mailing of a letter with a fraudulent intent to constitute "a scheme or artifice to defraud" within the meaning of the statute. The character of "the scheme or artifice" the law determines on a just consideration of the form in which it is pictured to the person who is expected to act on it, and whether the scheme thus represented is of such a character, if truly presented, as would ordinarily deceive a person capable of attending to his own affairs. If the plan does not have these characteristics, and, in consequence, does not constitute "a scheme or artifice to defraud," it is not converted into such "scheme or artifice" merely because two persons, instead of one, thought out the plan or agreed to execute it. The plan here formed for obtaining the ring is one of the simplest and commonest ways in which professed buyers cheat sellers, and is as old as human nature, and is not likely to deceive any one who is possessed of sufficient mental capacity to attend to the ordinary affairs of life. Sellers of goods to persons at a distance, particularly when engaged in the risky business of selling diamonds on a credit to

strangers, as the courts know from common knowledge, are always on their guard against such methods of swindling. A method so simple unfolded to the intended victim of the fraud merely in the form of an order to ship goods, without more, without any false description of anything, or any promise, and not intended to be preceded or followed by other statement of the schemers, cannot, we think, amount to a "scheme or artifice" within the spirit and the purview of the statute. This conclusion, we think, is inevitable from a just consideration of the words of the statute itself, the character of the evil sought to be suppressed, the history of the enactment designed to remedy the evil, and the objects of the power conferred upon Congress to regulate the mails.

The authority of Congress to enact statutes preventing the abuse of the mail facilities is found in that clause of the Constitution which confers the power to establish post offices and post roads. Congress has no grant of authority to regulate morals or to exercise the police power proper which is retained by the states. The statute does not ascertain or define, otherwise than by the general description "scheme or artifice to defraud," what methods or conduct in effecting a fraud by the use of the mails the statute intends to proscribe and punish. Unless the plan or method in effecting a fraud by the use of the mails is of such a nature as to constitute "a scheme or artifice to defraud" within the meaning of the postal laws, it is not punishable under the statute. Were the words "scheme or artifice" as used in this statute intended as a mere equivalent of plan or mode for effecting a fraud? Every choosing of means or determination of the steps to be taken to effect any given end may, in a general sense, be said to be the devising of a plan or method to accomplish that end, and, if every plan or method for working a fraud be treated as "a scheme or artifice to defraud" within the meaning of the statute, every intentional use of the mails to effect a fraud, whatever its nature or however remotely or indirectly it assisted in the perpetration of the fraud, would fall within the purview of the statute. Such a construction would inevitably result in the federal courts supervising the credit transactions of the country in a large measure, through the administration of the criminal statutes. Every person who filled an order for goods on a credit where the mails were used could, and many would, prosecute the delinquent debtors before the federal courts on the simple, naked charge that they entertained the intent not to pay for the goods but to defraud, when the order was posted, and thus used the mails in effecting "a scheme or artifice to defraud." It would burden their dockets with many unfounded prosecutions, and result in the nature of things in much oppression. If such was the intent, why was it not expressed in a simple and direct provision, to the effect that any person who resorted to the mails to aid him in effecting a fraud of any kind would be punished criminally? The practical difficulties of rightly solving such questions, where, primarily, only the relation of debtor and creditor exists, and the criminality depends on a mental status, which is seldom capable of direct proof, has led to the policy in many of the states not to deal with such forms of fraud by criminal pro-

ceedings, but to leave the wrong and injury to be redressed by civil remedies. The inquiry suggests itself why Congress, which is familiar with the meaning and use of words if it intended to deal with every fraudulent use of the mails, employed such careful phraseology to express that purpose. Although Congress has power to punish any use of the mails for any fraudulent purpose in any manner whatever, a policy so far-reaching in its consequences and so likely to promote abuses ought not to be imputed to its legislation on the subject, in the absence of language manifesting such an intention in the clearest and most unequivocal terms.

. "It is a familiar rule that a thing may be within the letter of the statute, and yet not within the statute, because not within its spirit, nor within the intention of its makers. * * * Frequently words of general meaning are used, words broad enough to include the act in question, and yet a consideration of the whole legislation and the circumstances surrounding its enactments or the absurd results which follow from giving such broad meaning to the words makes it unreasonable to believe that the legislator intended to include the particular act." Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226. "A literal interpretation of words in most common use, and having a well-defined meaning as ordinarily used, would not infrequently defeat, rather than accomplish, the intention of the party using them. The ground and cause of making the statute explains its intent." Smith v. People, 47 N. Y. 330. "Nothing is perhaps more frequently misunderstood than language often is which at first blush appears to be plain, if considered by itself. The subject, the occasion, the surroundings, and the end to be accomplished must be steadily kept in view." Lane v. Kolb, 92 Ala. 643, 9 South. 875.

The causes which led to the passage of the statute are well known. In a vast and growing country like ours, with its excellent mail facilities, unscrupulous persons were in the habit of utilizing the post office establishment for the purpose of effecting frauds and cheats upon the ignorant or unsuspecting in many seductive ways. The mails were flooded with letters and prospectuses concerning all manner of enterprises and ventures in which individuals were invited to participate. These projects in which persons were thus solicited to become interested seldom had any relation to the ordinary purchase and sale of commodities in the markets, or the customary operations of trade and commerce. They were generally paraded in the garb of proposals or offers of some kind, which, under the circumstances set forth, were asserted to afford rare opportunities of gain, or the betterment in some way of conditions of mind, body, or estate of those who would act on the faith of the representations. While these projects and offers differed widely in scope and nature, the manner of their presentation through the mails was always marked by the same distinguishing characteristics, when they were conceived with a fraudulent intent. The "scheme or artifice" was invariably bolstered by false pretenses, such as that the schemer or his associates were engaged in a particular calling or occupation, when in fact not so engaged; or that he was managing or promoting some existing or contemplated enterprise, when

no such enterprise was in existence or contemplated, or, if actually undertaken, was materially different in conditions from that described; or that money or property intrusted to him in carrying out the scheme would be applied in a particular way, when he had the intent not to apply it at all, but to convert it to his own use; or that he was manufacturing or selling some particular kind of wares or goods when he was not so engaged, or, if he was making or selling them, intended to fill orders with worthless imitations, or not to fill them at all; or where he represented the wares and goods were valuable for particular purposes, when he knew, although he furnished them, they were worthless for such purpose, or that he possessed certain skill or attainments, the exertion of which would accomplish certain results for those employing him, when, in fact, he possessed no such skill or attainments, or, if he did, knew he could not effect what was promised, or did not intend to exert them as he promised; or other like circumstances to induce persons to negotiate with him through the mails that he might defraud them.

The misuse of the mails in these and kindred modes was the evil intended to be suppressed, and the examples we have given clearly point out the nature and scope of the conduct and misbehavior in the use of the mails which Congress had in mind when it spoke of "any scheme or artifice to defraud." The purpose of the statute was to prevent the circulation through the mails of cunning appeals to human passion for gain by untruthful and seductive embellishment of advantages of engaging in ventures, begetting confidence where it would not otherwise be bestowed, and luring persons of ordinary prudence and intelligence into fraudulent transactions and ventures, in which they would not otherwise be persuaded to embark. In short, as said in Durland v. United States, 161 U. S. 307, 16 Sup. Ct. 508, 40 L. Ed. 709, the statute meant to put an end to the use of the mails in tempting and cheating the ignorant and unsuspecting by the allurement "of schemes glittering and attractive in form, though unreal and deceptive in fact." United States v. Clark (D. C.) 121 Fed. 190; Post v. United States, 135 Fed. 1, 67 C. C. A. 679, 70 L. R. A. 989; United States v. Mitchell, 36 Fed. 492, 1 L. R. A. 796; United States v. Owens (D. C.) 17 Fed. 72. Beyond this, the statute did not intend to go. When it spoke of "scheme or artifice," it did not intend to cover, as we have endeavored to show, every method, however simple and crude, by which one man endeavors to defraud another, by proposal to buy his property, without intention to pay for it in any event. Such conduct, it is true, amounts to a cheat or fraud at the common law, and is immoral, and Congress has the right to punish it when the mails are used to effect such an end; but it has not expressed any intention to do so, except when such deceit and fraud are accomplished by methods which amount to "a scheme or artifice to defraud." The term, as used in the statute, includes much more than the sending of an order for goods with the intent not to pay for them, and thereby to defraud the seller. On the other hand, the fraudulent conduct which will bring the schemer within the statute is not confined to fraudulent misrepresentations as to past or existing facts, and the schemer may be

guilty by the making of a fraudulent promise as to something to be done in the future, if the false promise be interwoven or connected with other intentional misrepresentations so cunningly blended and presented that they would ordinarily mislead a man of common prudence. There must always be a "scheme or artifice" of which the promise forms a part to bring the offender within the statute. A mere fraudulent promise to be performed in the future, whereby one obtains goods from another, without paying for them, disconnected from anything in the transaction which amounts to a "scheme or artifice," will not suffice to uphold a conviction for a violation of section 5480 of the Revised Statutes as amended by the act of March 2, 1889. Whether such conduct would come within the statute, as it appears greatly enlarged in section 215 of the Penal Code (U. S. Comp. St. Supp. 1909, p. 1455), or whether the making of a fraudulent promise as a means of obtaining property, constitutes a "scheme or artifice" within its meaning, is not involved on this writ of error, and no opinion is intended to be expressed as to it. The inclusion in the revision of the statute of the words "for obtaining money or property by means of false or fraudulent pretenses, representations or promises," not found in it before, after frequent amendments to broaden the scope of the legislation, is persuasive at least that Congress in its legislation prior to that amendment has not construed a mere false or fraudulent promise, standing alone, to constitute a "scheme or artifice."

We are aware that general language is used in the opinion in Durland's Case, supra, which, considered apart from the case then before the court, would support a contrary conclusion. The scope and meaning of the general language in an opinion must, of course, be confined to the facts of the case before the court. In that case the indictment alleged an elaborate scheme to defraud, of which the promise to be performed in the future was only one of the constituent elements. The Provident Company had fraudulently obtained large investments in its business, and held out fraudulent promises about the maturity and redemption of its investment bonds and the return of investments, with no intention of carrying out the scheme presented, on the faith of which scheme the money was invested. The indictment charged a fraudulent device in the organization and promotion of a business whose advantages were cunningly and seductively held out to the public, in the nature of a lottery, with the fraudulent intention of procuring the money of others on the faith of the scheme thus held out, with no intention of honestly executing it. There was much more than a mere naked promise to pay for goods, fraudulently made, and never intended to be kept. In Culp v. United States, 82 Fed. 990, 27 C. C. A. 294, apparently a scheme such as here charged was held to fall within the statute. The indictment itself is not set out in the report of the case. The argument here as to the proper construction of the statute does not seem to have been presented to the court in that case, and the only question actually decided in the opinion, though it contained dicta on the points here presented, was whether the act of March 2, 1889, operated to narrow the scope of, or repeal, section 5480 of the Revised Statutes.

For these reasons, the judgment of the Circuit Court is reversed, the verdict of the jury set aside, and the cause is remanded, with instructions to enter judgment sustaining the demurrer to the indictment on the third, fifth, and eighth grounds.