## BETTMAN v. UNITED STATES.

### (Circuit Court of Appeals, Sixth Circuit. July 20, 1915.)

### No. 2740.

1. POST OFFICE ☞35—OFFENSES AGAINST POSTAL LAW—USE OF MAILS TO DE-
FRAUD—STATUTE.

Criminal Code (Act March 4, 1909, c. 321) § 215, 35 Stat. 1130 (Comp.
St. 1913, § 10385), declares that whoever, having devised or intending to
devise any scheme or artifice to defraud, or for obtaining money by means
of false pretenses, shall, for the purpose of executing such scheme, place
any letter, writing, or advertisement in any post office of the United
States, to be sent by the post office establishment, or shall take or receive
any such therefrom, shall be punished. The statute as first enacted in
1872 (Act June 8, 1872, c. 335, 17 Stat. 283) omitted the words "or for ob-
taining money or property by means of false and fraudulent pretenses."
The statute was amended in 1889 (Act March 2, 1889, c. 393, 25 Stat.
873 [Comp. St. 1913, § 10385]), so as to cover the subject of dealing in coun-
terfeit money, and when incorporated in the Code the words "or obtain-
ing property by means of false or fraudulent pretenses" were added after
the words "scheme or artifice to defraud," while the requirement that the
intention to use the post office establishment must be an element of the
original scheme was eliminated. *Held*, that the statute in its present
form applies to the act of one engaged generally in a legitimate business,
who, for the purpose of obtaining money or property for financial gain,
knowingly makes a false statement of his financial condition, and sends
such statement through the mails.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec.
Dig. ☞35.]

2. POST OFFICE ☞48—POSTAL CRIMES—USE OF MAILS TO DEFRAUD—INDICT-
MENT.

Defendant, who was president of a corporation, mailed a false state-
ment as to the corporation's financial condition to a company from which
the corporation desired to borrow money. The indictment, charging de-
fendant with using the mails to defraud, charged that the list of liabili-
ties, which was part of the financial statement, was intended by defend-
ant to be, and was, false and fraudulent. *Held*, that the indictment was
sufficient to charge that defendant knew the falsity of his financial state-
ment.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80; Dec.
Dig. ☞48.]

3. POST OFFICE ☞35—POSTAL CRIMES—USING MAILS TO DEFRAUD.

Accused, the president of a corporation, prepared and sent a false
financial statement to one through whom he expected to borrow money.
In the statement the liabilities of the corporation were much underestimat-
ed, though according to the corporate books the corporation was then
solvent. Criminal Code, § 215, declares that whoever, having devised a
scheme to defraud, shall send anything through the mails to carry out
his plan, shall be punished. *Held* that, though the corporation was then
solvent, an intent to injure might still be inferred, for the purchasers of
the paper were injured when the possession of their money was obtained
by materially false representations of the financial worth of the bor-
rower, and they thereby subjected to substantial risk of failure to re-
cover back their money.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig.
☞35.]

4. POST OFFICE ☞49—OFFENSES—SCHEMES TO DEFRAUD—EVIDENCE.

In a prosecution for sending a false financial statement, through the
mails to one from whom defendant expected to borrow money for the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

corporation of which he was president, evidence *held* sufficient to warrant a verdict that defendant knew of the falsity of the statement.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.

Nonmailable matter, see notes to Timmons v. United States, 30 C. C. A. 79; McCarthy v. United States, 110 C. C. A. 548.]

5. CRIMINAL LAW ☞314—KNOWLEDGE OF CORPORATE OFFICERS—PRESUMPTIONS.

There is a presumption that the president of a corporation, who was the chief stockholder and managed its affairs, knew of the falsity of a financial statement which he signed and sent to one through whom he expected to borrow money for the corporation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 747; Dec. Dig. ☞314.]

6. CRIMINAL LAW ☞823—TRIAL—INSTRUCTIONS.

In a prosecution for sending through the mails, to one from whom defendant expected to borrow money, a false statement of a corporation's financial condition, the court charged that there was evidence that defendant knew that the statement was false, if the jury should find it was false. There was another instruction that defendant was not presumed to know the contents of the corporation's books, of which he was president, and for which he was acting, and he could not be charged with knowledge without a showing that he had such connection or familiarity with them as to justify an inference of knowledge. There was sufficient evidence to sustain a finding that defendant knew the falsity of the statement. *Held*, that the instruction was not erroneous, as defendant could not under the charge be convicted without a finding beyond a·reasonable doubt of his knowledge that the statement was false.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1992–1995, 3158; Dec. Dig. ☞823.]

7. POST OFFICE ☞49—OFFENSES—USE OF MAILS TO DEFRAUD—EVIDENCE.

In a prosecution for using the mails in a scheme to defraud, evidence *held* sufficient to show defendant's knowledge of the purpose of a financial statement which was required by one from whom his company desired to borrow money.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.]

8. CRIMINAL LAW ☞369—EVIDENCE—OTHER OFFENSES—USE OF MAILS TO DEFRAUD.

Where the president of a corporation was charged with sending through the mails a false financial statement to one from whom the corporation desired to borrow money, evidence of several loans made on the faith of such statement is admissible, for such evidence is at most unnecessary, and is not objectionable as relating to other offenses.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 822–824; Dec. Dig. ☞369.]

9. POST OFFICE ☞49—OFFENSES—USE OF MAILS TO DEFRAUD—EVIDENCE.

In such case, evidence that the loans would not have been made, had the falsity of the statement been known, is admissible.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.]

10. CRIMINAL LAW ☞444—EVIDENCE—ADMISSIBILITY.

In such case, where the prosecution desired to introduce the corporation's books, testimony that they had been in the possession of the witness since his election by corporate creditors as trustee in bankruptcy is ad-

missible, though the corporation's bookkeeper might have identified the books.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1028; Dec. Dig. ☞444.]

11. POST OFFICE ☞48—OFFENSES—USE OF MAILS TO DEFRAUD—INDICTMENT.
Where the indictment, charging the use of mails to defraud, used the language of a false financial statement sent by accused, a letter written by accused, correcting an obvious clerical error, was admissible, not amounting to an amendment of the indictment.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80; Dec. Dig. ☞48.]

12. CRIMINAL LAW ☞721½—TRIAL—REMARKS OF COUNSEL.
In a prosecution against the president of a corporation for using the mails to defraud, in that he sent a false financial statement to one from whom the corporation expected to borrow money, a witness was asked as to the form of notes given by the corporation. On objections by the defense that the notes were the best evidence, the district attorney, replying to the court's question whether he wished to be heard, stated that he did, but that one of them would force him to state it in the presence of the jury. He continued that the court was well familiar with the law, that accused could not be required to produce anything, and that the notes were in his possession. After exception by the defense, the district attorney withdrew his remarks. *Held*, that the record does not present an invasion of the defendant's privilege against self-incrimination.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1673; Dec. Dig. ☞721½.]

13. CRIMINAL LAW ☞1169—APPEAL—HARMLESS ERROR.
In such case, the admission of corporate books, which were not used to show corporate transactions after the false statement was sent, was harmless, though the books contained transactions thereafter.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 754, 3088, 3130, 3137–3143; Dec. Dig. ☞1169.]

14. CRIMINAL LAW ☞444—EVIDENCE—CORPORATE BOOKS.
In such case, where the bookkeeper, who was in charge of the corporation's books up to within a few days of the time when the false financial statement was sent, testified to their accuracy up to that time, and his successor testified to the accuracy of subsequent entries and the completion of the postings, the books were sufficiently authenticated to be received.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1028; Dec. Dig. ☞444.]

In Error to the District Court of the United States for the Southern District of Ohio; Howard C. Hollister, Judge.

Morris L. Bettman was convicted of using the mails to promote a scheme and artifice to defraud and obtain money by false pretenses, and he brings error. Affirmed.

Plaintiff in error was indicted upon two counts, under section 215 of the Criminal Code of the United States, for using the mails to promote a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises. There was conviction under both counts, and sentence of imprisonment and to pay the costs of prosecution. To summarize the indictment:

The first count alleges, in substance sufficient for present purposes, that defendant at the time of the transactions in question was the president (and a large stockholder) of the Bettman-Johnson Company, an Ohio corporation, with general supervision and control of its affairs, the corporation being in business in Cincinnati in the manufacture and sale extensively of liquors and

preserved fruits; that defendant on or about a date named desired to obtain large sums of money for the corporation through the services of E. Naumburg & Co., a New York brokerage firm engaged in buying commercial paper and placing the same in the hands of banks and other investors, it being the custom of Naumburg & Co. to obtain from those whose paper they intended to so handle statements regarding the financial condition of the borrowers, upon which those taking the paper relied; that accordingly, in order to obtain the credit necessary to float the proposed paper, the corporation and defendant made a financial statement of the affairs of the corporation; that this statement was intended by defendant to and did show that the assets of the corporation as of March 1, 1913, were $1,252,962.23, and its liabilities $440,581.44, the latter consisting of bills payable in the amount of $384,196.54 and accounts payable amounting to $31,384.90; that the list of liabilities was intended by defendant to be and was false and fraudulent, in that (a) the bills payable of the corporation amounted at the time stated to $326,889.37 in excess of the amount given in said statement, and (b) the accounts payable were at the time $146,862.52 more than the amount shown by the statement, and that the list of liabilities was thus false and fraudulent to the extent of $473,751.94; that in furtherance of the alleged scheme, and for the purpose of so obtaining such money, defendant sent this financial statement to Naumburg & Co., contained in a letter of the corporation, by defendant as its president, dated April 29, 1913, and caused by defendant to be mailed in the United States post office at Cincinnati, Ohio, for transmission and delivery to Naumburg & Co., with the intention that the latter should, in reliance upon the statement, buy the corporation's notes, and should send copies of the statement to various banks and others recommending their purchase of the paper, all of which was done with the intention on the part of defendant and the corporation that such investors should believe in the truthfulness of the financial statement; and that, had defendant correctly given therein the actual amount of the corporation's liabilities, the money and credit sought to be obtained through Naumburg & Co. could not have been secured.

The second count differs from the first principally in the facts that no reference is made to Naumburg & Co., and that the financial statement referred to is alleged to have been sent by mail to the Fifth-Third National Bank of Cincinnati, on May 1, 1913; that bank alone being alleged as intended to be defrauded, and having, in reliance upon the statement, loaned the corporation $15,000 on its notes.

Motion to direct verdict, made by defendant at the close of the government's case, was overruled, defendant offering no proof.

F. F. Dinsmore and Thos. H. Darby, both of Cincinnati, Ohio (Dinsmore & Shohl and Darby & Benedict, all of Cincinnati, Ohio, on the brief), for plaintiff in error.

E. P. Moulinire, Asst. U. S. Atty., of Cincinnati, Ohio.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). [1] 1. Reversal of the judgment below is asked on several grounds: The first ground is that the facts stated in the indictment do not constitute a "scheme or artifice" within the meaning of section 215 of the Criminal Code, the material portions of which are copied in the margin.[1]

[1] "Sec. 215. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false and fraudulent pretenses, representations, or promises * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter * * * writing * * * or advertisement * * * in any post office * * * of the United States * * * to be sent or delivered by the post office establishment of the United States, or shall take or receive any such therefrom, * * * shall be fined not more than one thousand dollars, or imprisoned not more than five years, or both."

Defendant's contention, broadly stated, seems to be that the statute does not apply to the act of one engaged generally in a legitimate business otherwise legitimately conducted, but who for the purpose of obtaining money, property or financial credit makes a knowingly false statement of his financial condition, either in a single instance or in a series of similar instances, not joined together, but independent of each other, but is confined to broader and more comprehensive frauds, such as the case of a business *systematically* and designedly so conducted generally that through false representations persons are induced to part with their money or property in the belief that they are getting something different from or better and worth more than what is actually being furnished, and especially to so-called "confidence games" and swindling devices, whereby the mails are resorted to for deceiving the ignorant and credulous generally by appeals to passion for gain by an untruthful and seductive setting forth of the advantage and attractiveness of the scheme exploited. It is urged that a clear distinction exists between "an intent to defraud" and the formation of a "scheme or artifice to defraud"; in other words, that the statute does not apply to the ordinary case of actual or attempted obtaining of money or property by false and fraudulent pretenses and representations, even though the post office establishment of the United States is employed in the execution of such fraudulent design.

We think the language and history of the statute, and the interpretation generally given it by the courts, forbid the narrow construction contended for. The statute as first passed (June 8, 1872, 17 Stat. 323) lacked the words "or for obtaining money or property by means of false and fraudulent pretenses, representations, or promises," found in article 215 of the Criminal Code; it made an original intention to employ the post office establishment a necessary element of the offense, and permitted the indictment to charge offenses to the number of three when committed within the same six calendar months, with provision for a single sentence proportioning the punishment "especially to the degree in which the abuse of the post office establishment enters as an instrument into such fraudulent scheme and device." The statute was later amended in a respect not immediately material, and became section 5480 of the Revised Statutes.

Long before the adoption of the Criminal Code the all-embracing scope of the statute had been affirmed by repeated decisions. In the leading case of Durland v. United States, 161 U. S. 306, 313, 16 Sup. Ct. 508, 511 (40 L. Ed. 709) it was held to include "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." Among the decisions of this court which have construed the statute equally broadly may be cited Foster v. United States, 178 Fed. 165, 172, 101 C. C. A. 485. As there, and elsewhere in substance, said, the statute was enacted to protect the public against all intentional efforts to despoil through the medium of the post office establishment.

That, in order to fall within the statute, a scheme need not be designed to defraud the public generally or the credulous especially, is established by Weeber v. United States (C. C.) 62 Fed. 740, decided at the

circuit by Mr. Justice Brewer (Judges Caldwell and Sanborn concur-ring), and by the decision of this court in Horman v. United States, 116 Fed. 350, 53 C. C. A. 570, in an opinion written by the present Mr. Justice Day, in each of which cases a scheme to blackmail directed solely and specifically against a given individual or group of individuals was held a scheme to defraud within the meaning of the statute. An application for writ of certiorari in the Horman Case was denied by the Supreme Court (187 U. S. 641, 23 Sup. Ct. 841, 47 L. Ed. 345). See, also, Goldman v. United States (C. C. A. 6) 220 Fed. 57, 135 C. C. A. 625. The proposition that the scheme or artifice to defraud contemplated by the statute is limited to such schemes or artifices as are accomplished by deception or trick was expressly rejected in the Horman Case. As there pointed out by Mr. Justice Day (116 Fed. 352, 53 C. C. A. 572), while the term "artifice" signifies deceit or trickery, the word "scheme" itself does "not necessarily involve trickery or cunning. A scheme may include a plan or device for the legitimate accomplishment of an object. But to come within the terms of the statute under consideration the artifice or scheme must be designed to defraud," and the term "defraud" was held to mean only "the wrongful purpose of injuring another." A fraudulent scheme may be within the statute, even though used in the prosecution of an established business, legitimate if honestly conducted. Harris v. Rosenberger (C. C. A. 8) 145 Fed. 449, 455, 76 C. C. A. 225, 13 L. R. A. (N. S.) 762; Foster v. United States, supra; Harrison v. United States (C. C. A. 6) 200 Fed. 662, 119 C. C. A. 78. In the late case of United States v. Stever, 222 U. S. 167, 173, 174, 32 Sup. Ct. 51, 53 (56 L. Ed. 145) Mr. Justice Lurton said:

"A scheme to defraud by means of false pretenses is, as we have seen, 'a scheme or artifice to defraud' within the plain meaning and purpose of this section" (5480).

As to the point that there is a difference between an "intent to defraud" and the formation of a "scheme or artifice to defraud," it was said by Judge Richards, speaking for this court in O'Hara v. United States, 129 Fed. 551, 555, 64 C. C. A. 81, that:

"The intention to make false and fraudulent representations by means of circulars and letters transmitted through the mails, and thus obtain money from the credulous, constituted the scheme itself."

The statute was amended March 2, 1889 (25 Stat. 873), so as expressly to cover the subject of dealing in counterfeit or spurious money and other articles specified, which had previously been held not covered by the original act. The Criminal Code (March 4, 1909) made these changes: (a) It added after the words "scheme or artifice to defraud" the words "or for obtaining money or property by means of false or fraudulent pretenses, representations or promises"; (b) it eliminated the requirement that the intention to use the post office establishment be an element of the original scheme, although the actual use of the mails in furtherance of the scheme is essential (United States v. Young, 232 U. S. 155, 160, 34 Sup. Ct. 303, 58 L. Ed. 548); and (c) the provision that the punishment be proportioned to the degree in which the abuse of the mails enters into the scheme was naturally eliminated. Since the

adoption of the Criminal Code the United States Circuit Court of Appeals for the Second Circuit has held that the use of the mails for the transmission of a false financial statement to commercial agencies, with the intent that it should be used as a basis for the purchase of goods on credit to which defendant was not entitled, is a "scheme or artifice" within section 215 of the Criminal Code. Scheinberg v. United States, 213 Fed. 757, 759, 130 C. C. A. 271, Ann. Cas. 1914D, 1258. This decision is directly in point and is persuasive.

We are asked to reject the Scheinberg Case upon the authority of Etheredge v. United States (C. C. A. 5) 186 Fed. 434, 108 C. C. A. 356, in which a construction is put upon section 5480 inconsistent with the construction of section 215 of the Code adopted in the Scheinberg Case. We are not satisfied to follow the Etheredge Case, because we think some of the views there expressed are out of harmony with some of the decisions of this court (notably the Horman Case, already cited), and because the case is opposed to the holding of the Circuit Court of Appeals for the Third Circuit in Culp v. United States, 82 Fed. 990, 27 C. C. A. 294 (cited with approval by this court in Milby v. United States, 109 Fed. 642, 48 C. C. A. 574), and with the decision of the Circuit Court of Appeals for the Fourth Circuit in Charles v. United States, 213 Fed. 707, 712, 130 C. C. A. 221, Ann. Cas. 1914D, 1251, decided since the adoption of the Criminal Code. It is, moreover, to be noted that the learned judge who wrote the opinion in the Etheredge Case expressly refrained from deciding whether the conduct involved in that case "would come within the statute, as it appears greatly enlarged in section 215 of the Penal Code."

Defendant urges that the section of the Code referred to has not enlarged the scope of the term "scheme or artifice to defraud," that its only effect is to make it unnecessary that the use of the mails be a part of the original scheme to defraud, and that the Scheinberg Case is based upon a misapprehension that the statute as previously existing was broadened by the Code provision. We cannot accept this contention, for we think the statute has been broadened by each amendment made thereto. It is well settled that the effect of the amendment of 1889 was to expand the statute. Culp v. United States, supra, 82 Fed. at page 990, 27 C. C. A. 294; Milby v. United States (C. C. A. 6) 120 Fed. 1, 4, 57 C. C. A. 21; Lemon v. United States (C. C. A. 8) 164 Fed. 953, 956, 90 C. C. A. 617. And in Charles v. United States, supra, 213 Fed. at page 710, 130 C. C. A. at page 224, Ann. Cas. 1914D, 1251, both the amendment of 1889 and the Criminal Code of 1909 are held to have enlarged the scope of the act, "thereby showing that it is the intention of Congress to reach any and all classes of individuals who may form the intention of using the mails for fraudulent purposes." As already said, the Etheredge Case recognizes the broadened scope of section 215. The natural inference that Congress intended to broaden the statute by adding the words "or for obtaining money or property by means of false and fraudulent pretenses, representations, or promises," is not appreciably weakened by the fact that as construed by the Supreme Court (United States v. Stever, supra) such was already its effect; the amendment at least registered the congressional intent that such should

be its construction. The elimination of the requirement that the use of the mails form part of the original scheme is also more or less significant of an intention to extend the scope of the statute beyond the class of swindling devices which defendant urges where solely within the contemplation of the act as originally passed. Indeed, the language of Mr. Justice McKenna in the Young Case, 232 U. S. 161, 34 Sup. Ct. 303, 58 L. Ed. 548, seems by implication to treat the section of the Code as an enlargement of the statute; and although the specific question whether the indictment charged "a scheme or artifice" under the Code was not presented for determination, nor in terms passed upon, it is perhaps not entirely without pertinency that the scheme involved in the Young Case was similar in nature to that before us.

In view of the interpretation put upon the statute both before and since the amendment effected by the Code, we need not consider the argument based upon either (a) the remarks of the chairman of the congressional committee in presenting the bill which resulted in the original act of 1872, or (b) the fact of the late pendency in Congress of a bill prohibiting the sending through the mails of false financial statements for procuring loans and credits. We may add that the doctrine of the Trinity Church Case, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, is plainly inapplicable.

In our opinion, each count of the indictment alleged a scheme to defraud within section 215 of the Criminal Code.[2] We see no inconsistency between this conclusion and the remark of Judge Denison, speaking for this court in Harrison v. United States, supra, 200 Fed. at page 666, 119 C. C. A. at page 82, that "the 'schemes' which have been punished have all smacked of the confidence game." That statement was by way of elaboration of the underlying proposition that a scheme to defraud cannot be found in any mere expression of honest opinion as to quality or future performance, nor to mere "puffing" or exaggeration in respect to articles which have substantial merit, if within proper and reasonable bounds. The scheme we are considering, if established, was in a not improper sense a "confidence game."

[2] Upon the suggestion that there is no allegation in the indictment that defendant knew the falsity of the financial statement, especially in reference to the items in which it is alleged to be false, it would seem enough to say that the indictment expressly charges that the "list of liabilities was intended by defendant to be and was false and fraudulent in this, to wit," etc. Defendant could not properly fail to understand from the indictment, taken as a whole, that he was charged with sending a knowingly false statement. The certainty required in an indictment is only such as will fairly inform the defendant of the crime intended to be alleged, so as to enable him to prepare for defense and so as to make the judgment a complete defense to a second prosecution for the same offense. United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516; Foster v. United States, 178 Fed. at page

---

[2] See, also, the opinion of this court in Tucker v. United States, 224 Fed. 833, —— C. C. A. ——, this day decided, in which a similar construction of the statute is adopted.

171, 101 C. C. A. 485; Tyomies Pub. Co. v. United States, 211 Fed. at page 389, 128 C. C. A. 47, and other cases there cited.

[3] 2. It is urged that the indictment does not charge and that the evidence does not show that there was a scheme or artifice *to defraud*. The argument is that the indictment does not charge that the corporation was insolvent, and that there was no evidence that it was a part of the scheme to give notes not worth par; that the scheme, in order to be criminal, must have contemplated the giving of notes not worth the money paid therefor, so that those taking the paper would receive at the most, something unsubstantial, although it is not claimed that it is necessary to prove that the notes were actually worth less than their face.

We are not impressed with this contention. The financial statement showed assets of $1,252,962.23, and liabilities of $440,581.44, leaving a net worth of $812,380.79. Taking into account the items of liabilities omitted, there would still remain a nominal surplus of $338,628.90. But the existence of this nominal or book surplus is not sufficient, as matter of law, to preclude the inference of an intent to defraud in making the alleged false statement. The assets included an inventory (presumably of merchandise, etc.) of $452,251.51 and bills and accounts receivable aggregating $691,262.55. In view of the well known fact that assets of this nature are subject to substantial shrinkage (while listed liabilities at least usually hold their own), and thus the existence of substantial danger that the notes would not be paid in full, it seems clear that an intent to injure may properly be inferred from a scheme to obtain money by means of the false representations alleged. It is not necessary to criminality under the act that nothing whatever is to be given in return for the money received (Harris v. Rosenberger, supra, 145 Fed. at page 459, 76 C. C. A. 225, 13 L. R. A. [N. S.] 762); nor is mere solvency of the borrower or the collectibility in fact of the notes necessarily conclusive against an intent to defraud (Lemon v. United States [C. C. A. 8] 164 Fed. 953, 962, 90 C. C. A. 617). In our opinion the purchasers of the paper in question were defrauded within the meaning of the law; that is to say, they were *injured* when the possession of their money was obtained by materially false representations of the financial worth of the borrower, and such purchasers thereby subjected to substantial risk of failure to recover back their money. Wilson v. United States (C. C. A. 2) 190 Fed. 427, 432, 433, 111 C. C. A. 231. Their money, in such case, was obtained by false and fraudulent representations. Stever v. United States, supra.

[4] 3. The point is made that the evidence does not tend to show that defendant knew of the falsity of the statement.

The principal considerations sustaining the alleged lack of knowledge of the statement's falsity are these: The two statements in evidence were typewritten, except the figures and signatures, which were in ink. There was testimony that the signatures are defendant's. There was no proof as to the handwriting of the figures, and the company's bookkeeper was unable to identify them as in defendant's handwriting; at the date of the statement the ledgers had not been posted for several months; the bills payable account was not so kept as to show at a

glance what its balance was; there was testimony that defendant was not a bookkeeper, and did not understand bookkeeping, and was not in the habit at least of examining the books; that the omitted accounts payable item consisted largely (if not entirely) of the account of the Clifton Springs Distillery Company, which did not appear upon the ledger, it not being the custom to make entries of accounts for goods purchased until paid for, and that the "inventory item" thus did not include the goods represented by this large account payable. It is urged that the statement could not be fraudulent so far as the accounts payable were concerned, as the net balance would be the same, had both the inventory and the accounts payable been increased to the extent in question.

On the other hand, there was testimony that defendant was in active charge and control of the company's affairs, including its finances. Our attention has been called to no evidence, and we have found none, affirmatively showing that the figures on the statement were not in defendant's handwriting. There was testimony that the books, taken together, included all entries necessary to determine the company's financial condition; that the ledger account itself would, when fully posted, contain on its face sufficient information to enable the exact extent of the bills payable account to be ascertained, requiring only sufficient knowledge of bookkeeping to distinguish between credit and debit items and how to add up figures to determine totals and balances; that defendant knew about the distillery company's account, and where the bills were kept, and had himself directed payment from time to time of certain of its bills.

In view of defendant's intimate connection with the business, and the asserted improbability that one so familiar with it, and in the habit of borrowing money for its conduct, would overlook bills payable to the extent of over $300,000, there was room for an inference of fact that defendant knew of the falsity of the statement respecting the bills payable; and even if it could be said that it could not be fraudulent to omit the item of accounts payable, under the circumstances stated, knowledge of the falsity of the item of bills payable was sufficient to sustain the verdict.

[5] Complaint is made that the court charged the jury that, if the statement was signed by defendant, he was presumed to know what was in it. This instruction was not error. The jury was not told that the presumption was conclusive.

[6] We think there was no error in the instruction that there was evidence that defendant had knowledge that the statement was false, if the jury should find it was false. We construe this instruction to mean only that there was evidence tending to show that the defendant knew whether the statement was true or false, for the court charged that the burden was upon the government to prove defendant's *actual knowledge* of its falsity beyond a reasonable doubt; that defendant was not chargeable with such knowledge of falsity merely because he might have been able to ascertain the correct amount of bills payable and accounts payable; but that if defendant's relation to the company's business was such that in order to manage it he must know its liabil-

ities, and he made the statement with the intent of influencing the conduct of those from whom he was seeking to borrow money, the jury would be authorized to believe that the statement was knowingly false.

An instruction was also given that defendant was not presumed to know the contents of the company's books; that he could not be charged with knowledge of such contents, without showing that he had such connection and familiarity with them as to justify an inference of knowledge; and that there was evidence that defendant was not a bookkeeper and paid no attention to the books. Under the charge, defendant could not be convicted without a finding beyond a reasonable doubt of his knowledge that the statement made was false in fact.

[7] 4. We see no merit in the contention that there was no evidence tending to show knowledge by defendant of the course of business of Naumburg & Co. There was testimony that the latter firm had been doing business with the Bettman-Johnson Company for six or seven years, buying their paper or advancing money against it and reselling to the banks, the notes being paid at the bank where the Bettman-Johnson Company had its account; that it was the custom of Naumburg & Co. to require financial statements from the customers whose paper they handled and to send copies to their branch offices, to various salesmen of paper, and to a line of some 14 banks; that three days before the statement in question was sent to Naumburg & Co. the latter wired the Bettman-Johnson Company:

"Banks asking for recent statement. What shall we tell them? Please telegraph."

The company replied that the statement would be sent the following Monday, on defendant's return. Three days later the statement was sent, signed by defendant, and a telegram sent by him to Naumburg & Co.: "Mailed you complete statement to-day." Six days later Naumburg & Co. deposited $48,000 in the Bettman-Johnson Company's bank to its credit and notified the company by wire, and on June 2d made a further deposit of $47,000 in the same bank, to the same credit, and with the same notice. Two days before this second deposit defendant sent Naumburg & Co. "November maturities to the amount of $50,000," with request to "make deposit as usual to our credit with the Mechanics' & Metals' National Bank," etc. In view of defendant's alleged management of the company's business, the correspondence and dealings referred to, and the not unusual commercial custom of requiring financial statements from large borrowers, there was in our opinion ample evidence tending to show defendant's knowledge of the purpose of the statement.

[8] 5. Complaint is made of the admission of several items of evidence, including Naumburg's testimony of the purchase of two installments of $50,000 each of the company's notes following the receipt of the statement in question; the fact of the receipt by the Fifth-Third National Bank of the financial statement mentioned in the second count and the loan of $15,000 to the company; that another bank discounted two notes for that company amounting to $35,000; that another bank

·received a copy of the statement, and thereafter bought the company's note for $5,000; that another witness received the company's financial statement in June, 1913, as well as evidence of the telegrams and letter from Naumburg & Co. relating to the loans involved.

It is urged that thereby evidence of the success of the scheme was improperly and prejudicially admitted, and that in effect evidence of other and distinct frauds was improperly let in. We are not impressed with either of these propositions. True, it was unnecessary to show that the alleged fraudulent scheme succeeded (Foster v. United States, supra, at pages 172, 173, 101 C. C. A. 485); but it does not follow that proof of its success is inadmissible. At the most, it was surplusage. Nor did the evidence in a proper sense relate to other and distinct offenses; it concerned the carrying out of the very scheme in issue.

[9] Equally without merit, in our opinion, is the criticism directed to the admission of testimony that neither Naumburg & Co. nor the Fifth-Third National Bank, nor the Mechanics' & Metals' Bank, would have made their purchases of the paper in question with knowledge of the alleged falsity of the financial statement.

[10] 6. The government produced as witnesses the two former bookkeepers of the Bettman-Johnson Company, as well as an outside accountant. Before introducing testimony relating to the books or the bookkeeping, the books were identified by the company's trustee in bankruptcy, who produced them under subpœna at the instance of the government, and who testified that the books had been in his possession since his election by the creditors as trustee on September 19, 1913, and that he was appointed receiver on the 18th day of the preceding August. (The statement as to receivership was volunteered, and was not objected to.) The testimony that the witness was trustee in bankruptcy was objected to as incompetent, immaterial, and prejudicial—the argument being that the jury might well have inferred from the fact of bankruptcy that "defendant is responsible for it, and in that way produce a prejudice against him"; also that the evidence tended to show a fact not alleged in the indictment, viz., that "it was part of the scheme to give notes not worth their face value." We think the question of pleading without merit.

It was proper to identify the books as lawfully in the trustee's possession for more than a year previous to the trial, and such testimony was neither immaterial nor incompetent; nor was it made improper by the fact that the company's former bookkeepers could have made the identification, nor because the proof may have incidentally tended to show that the notes in question were not good when given—no instruction as to the evidential effect of bankruptcy having been given or asked. The possibility of inference (even if prejudicial) that defendant was responsible for the bankruptcy itself is too remote to be substantial.

[11] 7. In the financial statement in question, under the head "Assets," appears the item, "Accounts payable, $564,319.74." The statement appears in this form in the indictment. Four days after the statement was mailed to Naumburg & Co., defendant wrote that firm:

"The words 'Accounts payable' in the assets were a slip of the tongue or a mistake of the stenographer. Please change same to read 'Accounts receivable,' and this letter is your authority for so doing."

The introduction of this letter is objected to as amounting to an amendment of the indictment, which, of course, is not permissible. The point is not well taken. The letter simply called attention to an obvious clerical error; and as defendant not only admitted, but himself voluntarily called attention to, it, he was not prejudiced.

[12] 8. The district attorney asked the witness Naumburg how the notes of the Bettman-Johnson Company which his firm purchased were made out. Defendant's counsel objected, on the ground that the notes would speak for themselves. The district attorney replied to the court's question whether he wished to be heard, that he did:

"But one of them would force me to state it in the presence of the jury. Your honor is well familiar with the rule of law; we are not able to ask the defendant to produce anything; the law makes it error for us to do that. These are not in our possession; they are in the possession of the defendant. We are not permitted to ask the defendant to produce anything."

This statement of the district attorney was excepted to, and the argument is made that thereby defendant's privilege against self-incrimination was invaded, as in effect calling to the attention of the jury the fact that the defendant had a right to testify or produce evidence and failed to do so, and that the case was thus brought within the principle applied in Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746; McKnight v. United States (C. C. A. 6) 115 Fed. 972, 54 C. C. A. 358; Foster v. United States (C. C. A. 6) 178 Fed. 165, 173, 174, 101 C. C. A. 485. We think the case is not brought within the principle referred to. There was no demand upon defendant for the notes, and the statement of the district attorney was simply called out by objection of counsel and inquiry of court. Moreover, there is no suggestion anywhere in the record or in brief that the notes contained or were claimed to contain anything of an incriminating nature. Still further, immediately following the exception, the district attorney disclaimed any purpose of demanding the notes, or of wishing to create any unfavorable impression, by saying:

"I didn't state we were unable to do it. I said we never asked for it. I will withdraw that statement, that we were unable to get them. I withdraw whatever statement I made; whatever it was, I will withdraw it all."

No instruction on the subject was given or asked. We think no error was committed.

[13, 14] 9. The admission in evidence of the books of account of the Bettman-Johnson Company was objected to on several grounds, which may be reduced in substance to three: (1) that the entries were not authenticated: (2) that there was no evidence tending to show any acquaintance or familiarity on the part of defendant with the books; and (3) that the books were not in the same condition as on either March 1, 1913, or May 1, 1913, but that many entries had been made since those dates, including the posting then greatly in arrears.

In view of the considerations heretofore and hereafter stated, we pass by as without merit the criticism that the books were not posted

up on the dates named. So far as the entries since March 1st (the date of the statement) are concerned, no prejudice could possibly have resulted to defendant, as the books were not used to show corporate transactions thereafter. In support of the second ground defendant invokes the decisions of this court in Foster v. United States, 178 Fed. 165, 175, 101 C. C. A. 485; and Worden v. United States, 204 Fed. 1, 6–10, 122 C. C. A. 315. The Worden and Foster Cases differ from the instant case in two respects: First, in neither was there any evidence that the books of account were properly kept, and their admissibility depended wholly upon the defendant's familiarity with the books, under the peculiar circumstances of the case; and, second, in neither was the prosecution based upon the statements of a corporate officer as to the financial condition of the business under his control, made for the purpose of obtaining credit. In this case there was affirmative evidence on the part of the bookkeeper who left the corporation's employ on February 28, 1913 (the day before the date of the financial statement in issue), that the books were correctly kept up to the time he quit, and on the part of the successor bookkeeper (who had been the assistant of her predecessor) that the entries made by her in the journal or cash book (presumably while assistant) were made correctly and recorded transactions occurring at about the time the entries were made, that after her predecessor left she completed the posting, and that the ledgers at the time of the trial contained the state of the business as of March 1, 1913.

In this state of the record, and in view of defendant's actual charge of the business, the books were admissible in evidence for the purpose of showing the falsity of defendant's statement of the corporation's condition, and regardless of the lack of evidence that he actually had personal charge of the bookkeeping or was familiar with the individual entries therein. Wilson v. United States (C. C. A. 2) 190 Fed. 427, 437, 111 C. C. A. 231; Parker v. United States (C. C. A. 2) 203 Fed. 950, 951, 122 C. C. A. 252. See, also, our opinion in the Worden Case, supra, 204 Fed. at page 10, 122 C. C. A. 315. The subject of the effect of the books as evidence against defendant was fully covered by the charge.

10. In conclusion, we have carefully considered defendant's insistence that the testimony, taken as a whole, is as consistent with innocence as with guilt, so as to bring the case within the ruling of this court in Harrison v. United States, supra, and the other cases cited by defendant and, as incidental thereto, the proposition that the only conclusion legitimately to be drawn from the evidence is that while defendant signed the statement some one else made it.

The record is not such as to justify the assertion of either proposition as matter of law. The case was peculiarly one for the jury. The trial court carefully protected the rights of the defendant, not only in the admission of testimony, but in a thorough and well-considered charge. Counsel have with industry and ability represented defendant's interests both in the trial court and here.

We are constrained to hold that no prejudicial (if, indeed, any) error has been shown, and that the judgment of the District Court should be, and it is, affirmed.