## PEOPLE *v.* COOK.

1. CRIMINAL LAW—FORGERY—EVIDENCE—ADMISSIBILITY.

In a prosecution of .a bank cashier for forging and utter-ing a promissory note, the admission of irrelevant and immaterial testimony tending to show that defendant had, by the exercise of bad judgment or reckless conduct, mismanaged the affairs of the bank and, as a result, had wrecked it, *held*, reversible error.

2. SAME—ADMISSIONS.

Where defendant admitted the signing of another's name to the note, but claimed he was authorized to do so, if he was not so authorized he was guilty of forgery.

3. SAME—INTENT TO BE INFERRED FROM ACTS.

Upon the question of intent to defraud, the jury had a right to infer that defendant did so intend from his act in placing the alleged forged note among the assets of the bank and later giving it to a third party as collateral security.

4. PROSECUTING ATTORNEYS—QUALIFICATION TO ACT IN CRIMINAL CASE.

Where the prosecuting attorney had disposed of his claim as a depositor against an insolvent bank before commenc-ing criminal proceedings against the cashier for forging and uttering a promissory note, he was not disqualified, under 1 Comp. Laws 1915, § 2410, from acting in said criminal case.

Error to superior court of Grand Rapids; Dunham, (Major L.), J. Submitted April 13, 1923. (Docket No. 109.) Decided June 4, 1923.

Frank J. Cook was convicted of forgery, and sen-tenced to imprisonment for not less than 5 nor more than 14 years in the State prison at Jackson. Re-versed.

*M. Thomas Ward, John J. McKenna,* and *Joseph R. Gillard,* for appellant.

*Cornelius Hoffius,* Prosecuting Attorney, for the people.

BIRD, J.    Defendant was convicted of forging and uttering a promissory note.    The proceedings are here for review upon writ of error.    Defendant was the cashier of a small private bank, known as the Farmers & Merchants Bank, located in the suburbs of Grand Rapids.    The bank was organized in 1914. Soon thereafter William E. DeGolia, a long time acquaintance of defendant, commenced to make small loans of the bank.    Those increased in frequency and amount until considerable sums were owing by him. Later certain collaterals were turned over to the bank to secure the loans.    After the loans had been running for some time it was suggested that DeGolia lumber 20 acres of valuable timber land which he owned in Barry county.    Defendant agreed, if he would do so, the bank would finance the lumbering operations with the understanding that the bank should have the proceeds of the lumber.    Under these arrangements DeGolia left Grand Rapids and moved to his farm.    He borrowed additional money to operate with and gave more notes.    From time to time these notes became due and DeGolia was advised and requested to come to the bank and renew them. On occasions he did not respond, which resulted in embarrassing the bank with past-due paper.

Defendant claims that to obviate the necessity of DeGolia coming to Grand Rapids to renew his notes and give notes for overdrafts, DeGolia authorized him to renew the notes as they fell due, and sign his name thereto.    Also to make notes for overdrafts.    By following this course the bank would be relieved of carrying past-due paper, and DeGolia would be re-

lieved of coming to Grand Rapids every time a note
was to be given or renewed.

Among the notes which DeGolia was owing to the
bank was one for $6,885.62.    When this note fell
due defendant claims he acted under his arrangement
with DeGolia, and renewed this note, signing DeGolia's
name thereto.    This new note was then placed among
the assets of the bank and later, when the bank needed
money, it borrowed $1,500 from one Charles Smith,
and the note in question was turned over to him as
collateral security.

Mr. DeGolia was sworn on behalf of the people and
denied that he had any such arrangement with de-
fendant or that he ever authorized him to sign any
notes for him.    With defendant's admission that he
signed the note and placed it among the assets of the
bank, and that he did so by virtue of the under-
standing with DeGolia, and DeGolia's denial that he
ever authorized defendant to sign notes for him, the
issue was reduced to a simple one, namely, whether
DeGolia ever authorized defendant to sign the note
in question.

1. The important assignments of error which we
have to consider relate to the wide latitude accorded
the prosecutor by the trial court in the introduction
of testimony and the cross-examination of defendant.
The record shows that the facts attending the organ-
ization of the bank in 1914 were gone into.    Its loans,
and to whom, and the solvency of the borrowers were
shown more or less in detail.    In fact, its manage-
ment, or mismanagement, was shown from the time it
opened its doors until it closed them seven years
later, and made an assignment to the Michigan Trust
Company.    And even events transpiring after the
assignment was made were shown in the testimony.

By way of elaboration of these items, it was shown
by David R. Eason, an ex-bank examiner, and an

employee of the Ellis bank, that he was sent by Mr. Ellis to the Farmers & Merchants Bank to examine collateral offered by that bank to the Ellis bank in payment of balances.    The prosecutor was permitted to show by him the collateral which he examined and to testify to whom the loans were made.    It was shown that the Hanford Lumber Company had borrowed $87,000; the Bartlett Grain and Milling Company, $83,000; Colon C. Lillie, $5,000; Ox-Welding Company, $5,300; Liberty Candy Company, $14,083; Mills & Healey, $7,500, and many other loans of lesser amounts.    Mr. Eason was permitted to express an opinion as to whether they were good or bad loans and to discuss them generally, and was also permitted to express an opinion as to whether certain acts on behalf of the bank was good banking.

These matters were gone into again upon cross-examination of defendant. Defendant was questioned at some length about the house he lived in, how much he paid for it, and if he paid more than it was worth. He was interrogated about an automobile which he had purchased since the bank had failed, and was examined at some length about other business concerns in which he was interested.    His differences with the directors of his bank were gone into as well as the suit which defendant had begun against them after the closing of the doors of the bank.    The financial condition of the bank when it closed its doors; also as to the people who made deposits in the bank a short time before it failed; what the salaries of himself and the employees were and how much rent he paid were all inquired about.

It appears that defendant purchased of one Crosby a farm situate in Montcalm county.    The question whether he owned it or the bank owned it was the subject of a long cross-examination.    The deals and loans made by his son and son-in-law were aired to a

considerable extent.    How his son and son-in-law ac-
quired the Crosby farm was inquired about at some
length.    Defendant's differences and law suit with
Crosby in Montcalm county were the subject of much
cross-examination.    This examination included in-
terrogatories as to the condition of the cattle on the
farm, whether the cattle were Jerseys, how much he
paid for the farm, where he got the money from to
pay the mortgage held by the Northwestern Mutual
Life Insurance Company, and whether he testified to
certain things in that court.    The written assignment
of the mortgage to defendant was offered and received
in evidence.    This cross-examination ran on into
50 pages of record.    During this cross-examination
no reference was made to the note in question, and
DeGolia's name was mentioned only twice, and then
in an immaterial way.    So far as throwing any light
on the charge against defendant the prosecutor and
the defendant might as well have discussed the merits
and demerits of the proposed League of Nations.

Had the development of this irrelevant and im-
material testimony resulted only in a waste of time
it would not be so serious, but the whole tendency of
the objectionable testimony introduced was to show
that defendant had, by the exercise of bad judgment
or reckless conduct, mismanaged the affairs of the
bank, and as a result had wrecked it.    This was
harmful to defendant's case.    More or less ill feeling
exists in every community toward officials of a defunct
bank, and an attempt to review instances of bad
judgment and wrongdoing of a managing official in
the presence of a court room well filled with dis-
appointed depositors was well calculated to excite an
unwarranted prejudice against defendant on the issue
that was being tried.    The testimony should have
been confined to the issue, and if defendant were
guilty of other offenses in relation to the mismanage-

ment of the bank, he could have been made to answer to them in another proceeding.

If DeGolia did not authorize defendant to sign the notes he was guilty of forgery, under his own concession. Upon the question of intent to defraud, the jury had a right to infer that he did so intend from his act in placing the note among the assets of the bank and later giving it to a third party as collateral security. By reason of the introduction of the immaterial matters defendant was deprived of a fair trial and the judgment of conviction must be set aside.

2. Objection was raised to Mr. Hoffius, the prosecuting attorney, appearing on behalf of the people because of his interest in the affairs of the bank. The record discloses that Mr. Hoffius was a depositor in the bank when it closed its doors. Following the closing of the bank Mr. Hoffius made proof of his claim and filed it with the assignee. Later, and before this proceeding was commenced, he sold and indorsed his claim to another without recourse. The question, therefore, presents itself, whether, under these circumstances, the interest of the prosecutor was such as to disqualify him under 1 Comp. Laws 1915, § 2410:

"No prosecuting attorney shall receive any fee or reward from or on behalf of any prosecutor or other individual for services in any prosecution or business to which it shall be his official duty to attend, nor be concerned as attorney or counsel for either party other than for the State or county in any civil action depending upon the same state of facts upon which any criminal prosecution commenced or prosecuted shall depend, or in any action for malicious prosecution commenced or prosecuted during his term of office in the county of which he is prosecuting attorney; nor shall any attorney be permitted to prosecute, or aid in prosecuting any person for an alleged criminal offense where he is engaged or interested in any civil

suit or proceeding depending upon the same state of facts, against such person directly or indirectly."

Without discussing what position Mr. Hoffius would have been in had he not disposed of his interest as a depositor, we think when he disposed of his interest therein he relieved himself from any disqualification so far as the inhibitions of the statute are concerned. The concluding inhibition of the section appears to have reference to a *present* interest rather than a *past* one.

A judge is not disqualified by reason of his having once owned stock in a corporation which was disposed of before the commencement of the proceedings. 23 Cyc. p. 577, and cases.  The disqualification of a judge on account of interest may be removed by relinquishing of his interest or the transfer of it.  23 Cyc. p. 598, and cases.  It appearing that Mr. Hoffius disposed of his interest in the deposits before the commencement of this suit, we see no reason for holding that he was legally disqualified to act as public prosecutor in the case.

On account of the views which we entertain with reference to the error of the trial court in the admission of testimony, we think it will be unnecessary to consider the remaining assignments of error.

The judgment of conviction will be set aside and a new trial ordered.

WIEST, C. J., and FELLOWS, CLARK, SHARPE, MOORE, and STEERE, JJ., concurred.   McDONALD, J., did not sit.