## PEOPLE v. LARSON.

1. CRIMINAL LAW—FALSE PRETENSES—FORGERY—STATUTES.

   The fraudulent obtaining of signatures to a copartnership agreement whereby the signers became liable for the debts of the copartnership is an offense within the meaning of 3 Comp. Laws 1915, § 15320, since the forging of names to a partnership agreement, if it creates a liability, is, in the law, forgery although not expressly mentioned in the forgery statute (section 15432).

2. SAME—PLEADING—INFORMATION—DUPLICITY.

   An information charging the fraudulent obtaining of five signatures to articles of copartnership is not open to the objection that it is duplicitous in that it charges five different offenses, since it charges a single offense which injuriously affects five men.

3. SAME—EVIDENCE—BOOKS OF ACCOUNT—IDENTITY.

   Testimony by one of the experts who had examined the books of account of the partnership that the books offered in evidence for the purpose of showing that the partnership was insolvent at the time the signatures were obtained were the books kept in the ordinary course of the business, held, to sufficiently identify them.

4. SAME—EVIDENCE—ADMISSIBILITY.

   Testimony that defendant in procuring the signatures to the partnership agreement represented that the partnership was solvent, that he offered an inspection of the books to prove it, and that the books were kept under his direction rendered them admissible, and the fact that other entries were made in the books after defendant left would not make the entries made before defendant left incompetent.

5. SAME—TRIAL—REMARKS OF COURT.

   Remarks of the trial court made while admitting or rejecting testimony in defendant's behalf, held, not reversible error.

6. SAME—COURTS.

   Trial courts should refrain, as far as they can consistently,

On procuring signature by fraud as forgery, see note in 14 A. L. R. 316.

On fraudulently procuring genuine signature as forgery, see note in 26 L. R. A. (N. S.) 138.

from giving the jury any impression which they may have of the merits of the defense or of the guilt of the defendant.

7. SAME—EVIDENCE—ADMISSIBILITY.

The admission of testimony that, in addition to the loss of the money paid into the partnership on signing the partnership agreement, the signers lost all that they had, *held*, reversible error, since it tended to create sympathy for the losers and prejudice defendant in the minds of the jury.

8. SAME.

The fact that the partnership continued under other management 20 months after defendant left also rendered said testimony inadmissible; the collateral issue as to how much of the loss was due to defendant's bad management, and how much to the bad management of others being thereby raised.

Error to Manistee; Cutler (Hal L.), J.    Submitted October 11, 1923.    (Docket No. 131.)    Decided December 19, 1923.

Lauritz A. Larson was convicted of obtaining money by false pretenses, and sentenced to imprisonment for not less than 5 nor more than 10 years in the State prison at Jackson.    Reversed.

*A. B. Lovejoy* and *Howard L. Campbell*, for appellant.

*A. W. Penny* and *P. T. Glassmire*, Special Prosecuting Attorneys, for the people.

BIRD, J.    In 1917 defendant was a member of the banking firm of Brewster, Larson & Company, operating private banks at Copemish and Arcadia, in Manistee county, and Mesick, in Wexford county.    By reason of losses occasioned by bad and worthless paper, the banks of Copemish and Mesick, in the latter part of the year 1917, were hard pressed for funds.

In order to relieve this situation and restore confidence in the banks, defendant induced four farmers and one merchant living in the vicinity to become partners in the bank of Copemish and Mesick, and induced each of them to advance $1,000 to the banks. This help for a time steadied the situation, but the banks were so badly involved that within two years thereafter they were obliged to go into the hands of a receiver and have their affairs wound up. The investment by the five men resulted disastrously to them and they caused defendant and Charles W. Beatty, who managed the Mesick bank, to be arrested for obtaining money from them and obtaining their signatures to the partnership agreement by false pretenses, in violation of 3 Comp. Laws 1915, § 15320. Defendant Larson demanded a separate trial. This was given him and he was convicted and sentenced to prison.

1. A motion was made to quash the information on the grounds: (*a*) That no offense is set forth in the complaint. (*b*) That the information is bad for duplicity.

(*a*) The statute under which the information is filed provides that:

"Every person who, with intent to defraud or cheat, shall designedly, by color of any false token or writing or by any false or bogus check or other written, printed or engraved instrument, by spurious coin or metal in the similitude of coin, or by any other false pretense, cause any person, natural or corporate, to grant, convey, assign, demise, lease or mortgage any land or interest in land, or obtain the signature of any person, natural or corporate, to any written instrument, the making whereof would be punishable as forgery, or obtain from any person, natural or corporate, any money or personal property or the use of any instrument, facility or article or other valuable thing or service, or by means of any false weights or measures obtain a larger amount or quantity of property than was bargained for, or by means of any false weights or measures sell or dispose of a less

amount or quantity of property than was bargained for, if such land or interest in land, money, personal property, use of such instrument, facility or article, valuable thing, service, larger amount obtained or less amount disposed of, shall be of the value of twenty-five dollars or less, shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding three months and if such land, interest in land, money, personal property, use of such instrument, facility or article, valuable thing, service, larger amount obtained or less amount disposed of shall be of the value of more than twenty-five dollars, such person shall be punished by imprisonment in the State prison not more than ten years or by a fine not exceeding five hundred dollars and imprisonment in the county jail not more than one year." 3 Comp. Laws 1915, § 15320.

Counsel make the point that the copartnership agreement is not such a written instrument "the making whereof would be punishable as forgery," and they argue that partnership agreements are not expressly mentioned in the forgery statute (§ 15432), and unless they can be found therein no prosecution could be maintained under section 15320. They also contend the articles of copartnership could have no legal efficacy in aiding anyone to defraud a third party.

While the general statute authorizing prosecutions for forgery does not expressly mention partnership agreements, we think the forging of names to a partnership agreement, if it creates a liability, is, in the law, forgery, and under section 15320 is open to prosecution as such. *Commonwealth* v. *Hutchison,* 114 Mass. 325. In the case cited the same question is raised on a similar statute. The question involved was as to whether a copartnership agreement could be the subject of forgery, and the court held that a prosecution for forgery of such an instrument could be maintained. Forgery includes any act which fraudulently makes an instrument purport to be that

which it is not. *People* v. *Marion*, 29 Mich. 35.
There is no statutory definition of forgery. At the
common law it is defined to be the making of a false
document with intent to defraud. *People* v. *Van
Alstine*, 57 Mich. 73. The articles of copartnership
in the instant case, when signed by the five men, were
recorded in the office of the county clerk, and filed
away in the vault of the bank. The moment these
five men placed their signature to the paper they
became liable for the debts of the copartnership, and,
at that moment, if their testimony is to be believed,
they were defrauded.

*b*. Under this head counsel contend that the in-
formation was duplicitous; that there were five dif-
ferent offenses charged in one count. This contention
is based upon the fact that five men were injuriously
affected by the false representations. The informa-
tion charged a single unlawful act which injuriously
affected five men. This does not charge five differ-
ent offenses any more than charging larceny of prop-
erty belonging to several different persons in one
count. *People* v. *Johnson*, 81 Mich. 573. The rule
of pleading in this regard is stated, as follows:

"A single act or transaction in violation of law may,
as a general rule, be charged in one count as a single
offense, although the act involves several similar viola-
tions of law with respect to several different persons.
Thus, when committed in the same act, larcenies from
different individuals may be joined, or robberies of
several persons at the same time and place, or the
reception of stolen goods belonging to different ones,
or a libel concerning several persons uttered by one
publication, or a slander, or the publication of several
obscene songs." 22 Cyc. p. 383.

We are of the opinion that the trial court was in
no error in refusing to quash the information for the
reasons alleged.

2. Counsel complain that the books of the several

banks were improperly admitted in evidence because not sufficiently identified. It was shown that the books of the banks of Copemish and Mesick were directly under defendant's direction and control. That defendant represented to the five men that the banks were solvent, and offered an inspection of the books of the bank to prove his assertion, although, at the same time, he suggested it would be unnecessary to have them examined. Bearing upon the question, the court asked one of the experts, who had examined the books, the following questions:

"*The Court:* I want to ask the witness a question. These books which you have referred to here, as being the books of the Arcadia bank and the bank of Mesick and Copemish bank, were the books kept in the ordinary course of the business of these banks, were they?

"*A.* The books run continuously, before and after both these dates—the dates mentioned here.

"*The Court:* You mean they are the books ordinarily kept in the course of the business, do you?

"*A.* Yes, sir.

"*The Court:* Regarding the transaction of those banks?

"*A.* Yes, sir.

"*The Court:* Regarding the transaction of those banks?

"*A.* Yes, sir.

"*The Court:* And all of them?    .

"*A.* All of them.

"*The Court:* And of the three of these banks?

"*A.* Yes, sir."

We think the proofs were sufficient to identify the books and make them admissible. The question presented here is somewhat different from the one which ordinarily arises in the admission of books. Usually where this question is involved there is an attempt to establish the liability of another by one's own books. Here defendant had represented to the five men that the banks were solvent, and offered an inspection of

the books to them to prove his assertion.    The mere
fact that the books contained other entries made after
defendant left the banks and Dixon became the man-
ager, would not make the entries made before de-
fendant left incompetent.

In *Pearson* v. *Wallace,* 203 Mich. 622, where the
parties in charge of a corporation were charged with
fraud and deceit, the question of the admissibility of
its books was raised, and the court said:

"Nor do we find reversible error in the rulings ad-
mitting the books of the gas company in evidence and
in permitting a witness to testify to what is contained
in them with his mathematical calculations based upon
what the books disclosed.    If the gas company keeps
books, if, as an expert in this case testified, the books
of account show, apparently, all receipts and disburse-
ments of money, if they show corporate meetings and
apparently what was done at the meetings, no reason
is perceived for refusing to permit their contents to
be given to a jury to prove the condition of the
company and the extent of the business carried on
by it."

It was said in *Bettman* v. *United States,* 140 C. C.
A. 265, 278, 224 Fed. 832, in dealing with this ques-
tion, that:

"In view of defendant's actual charge of the business
the books were admissible in evidence for the pur-
pose of showing the falsity of defendant's statement
of the corporation's condition, and regardless of the
lack of evidence that he actually had personal charge
of the book-keeping or was familiar with the in-
dividual entries therein."

In view of the testimony that the banks were in
charge of defendant and that the books had been kept
under his direction no error was committed in admit-
ting them.

3. Serious complaint is made concerning the attitude
of the trial court in admitting and rejecting testimony
in defendant's behalf.    It is claimed remarks were

made by the court while admitting proffered testimony tending to depreciate the value of the testimony or to lessen the force which it otherwise would have with the jury.    The following instance is an example of it.    In overruling an objection by the people the court said:

"I have given the respondent wide latitude, and more, perhaps, than he is entitled to.    I will receive it."

There are many assignments on similar instances. We have examined them but do not find in them sufficient reason for reversing the case.    It is difficult for this court to lay down any fixed rule as to what a trial court may say in admitting or rejecting proffered testimony, but we think trial courts should refrain, as far as they can consistently, from giving the jury any impression which they may have of the merits of the defense or of the guilt of the defendant.

4. It is urged that the trial court was in error in permitting the prosecutor to show by the five men, who claimed to be defrauded, that, as a consequence of the false pretenses they lost their farms, their personal property and all they had.    It was the position of the defense that after showing that the five men lost the $1,000 which each contributed to the copartnership, it was immaterial as to any additional sums they may have lost as a consequence of their becoming copartners in the bank.    But against their objection the people were permitted to show that the five men mortgaged their farms, and that in the final winding up of the business they deeded their property to the Michigan Trust Company as receiver for the banks.

On one occasion while counsel was protesting against the admission of such testimony, the following took place:

"*Mr. Lovejoy:* I may have a misapprehension what

we were on trial for, but I supposed we were on trial for obtaining the signature, as stated in the record, February 25, 1918, and the $5,000 that was put in by these men at that time.    Now, we do not understand that we are charged with the consequences that followed that.

"*The Court:* It could be no crime unless there were consequences following it.

"*Mr. Lovejoy:* It would be no crime to obtain the signature to a written instrument and $5,000?

"*The Court:* There would be no crime attached to the obtaining of a signature if it were not for the consequences that followed.

"*Mr. Lovejoy:* The immediate consequence was that I buy in this, by signing this partnership association— articles of copartnership.    The immediate result of that was that these men went in, to the extent, as they claim, of $1,000 each, and becoming members of the copartnership.

"*The Court:* That is, in the extent of what they got. The claim is, they lost their all, and the opening statement of counsel was they lost every dollar they had on the earth.    That was the claim, and they enumerated $40,000 for one, $65,000 for one and $35,000 for another.    I think those were the figures and it cannot be limited to $5,000."

We are impressed that defendant's counsel were right when they insisted that the crime charged was complete when the people showed the false representations as to the solvency of the banks, that the five men believed the representations, that they were false, and were deceived thereby, and that they paid in $5,000, which sum was wholly lost to them.    After this showing I can see no materiality in showing the extent of their losses.

Defendant was in a difficult position to make his defense of "good faith."    The failure of the bank and the fact that depositors received only 35 cents on a dollar tended to place the community in an unfriendly and antagonistic attitude toward him.    Allowing his victims to testify that aside from losing their invest-

ment of $1,000 each, they, as a consequence of becoming partners, lost all they had, and reciting the kind and value of it, had a tendency to create sympathy in the minds of the jurors in their behalf, and at the same time to inflame their minds against the defendant, who, they claimed, was responsible for their losses. The prejudicial thing about it is that when a juror's sympathy is unduly aroused for one party and his anger aroused against the other party, he is in no position mentally to fairly and impartially weigh the testimony and deal fairly with both parties. *People* v. *Cook*, 223 Mich. 291.

Another reason why the testimony was incompetent: The last 20 months in which the bank did business, Mr. Dixon was the manager. The five men did not deed their property to the receiver until the end of the Dixon term. During that term defendant had nothing to do with the bank; in fact he was out of the State. The question then arises, What proportion of their losses should be charged to Dixon's bad management, and how much to defendant's? This raises a collateral issue and a useless one. On account of the character of this testimony and the protracted discussion which it provoked between court and counsel, we are of the opinion that it was prejudicial to defendant's case, and, to the extent that it was, reversible error.

Other errors are assigned, but, as they are not likely to arise upon a new trial, they will not be considered.

The judgment of conviction must be set aside and defendant given a new trial.

Wiest, C. J., and Fellows, McDonald, Clark, Sharpe, Moore, and Steere, JJ., concurred.