STATE, Respondent, v. EWERT, Appellant.

(219 N. W. 817.)

(File No. 6468. Opinion filed June 4, 1928.)

*A. K. Gardner,* of Huron, and *McNamee, O'Keeffe & Stephens* and *John Sutherland,* all of Pierre, for Appellant.

*Buell F. Jones,* Attorney General, and *Martens & Goldsmith,* of Pierre, for the State.

KNIGHT, Circuit Judge. Upon an indictment presented and filed in Hughes county on November 14, 1925, the defendant, Adolph W. Ewert, was convicted of a misappropriation of money which came into his hands as treasurer of the South Dakota Rural Credit Board, which office he held from about July 1, 1917, until his removal by the Governor on February 4, 1925. From such conviction and from an order denying his motion for a new trial, he has appealed.

The indictment, omitting formal parts, is as follows:

"That Adolph W. Ewert, late of said county, on or about the 4th day of February in the year of our Lord one thousand nine hundred and twenty-five, at the county of Hughes, state of South Dakota, at a time when said Adolph W. Ewert was the duly appointed, qualified and acting treasurer of the South Dakota Rural Credit Board, then and there a department of the government of the state of South Dakota and a bureau created by the laws of said state, did at said time and place, willfully, fraudulently, unlawfully and feloniously appropriate and convert to his own use the sum of two hundred eleven thousand, four hundred thirty-seven dollars and fifty-nine cents, lawful money of the United States, of the value of two hundred eleven thousand, four hundred thirty-seven dollars and fifty-nine cents, which said money was then and there the property of said South Dakota Rural Credit Board, and which said sum of money had, prior to said date, and between the 29th day of August, 1922, and said 4th day of February, 1925, both dates inclusive, been collected and received by said Adolph W. Ewert as treasurer of said Rural Credit Board for and on behalf of said South Dakota Rural Credit Board, contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of South Dakota."

Upon the overruling of a demurrer to the indictment, which will be hereinafter discussed, the defendant entered a plea of not guilty, and upon his application the trial was removed to Faulk county. On November 25, 1925, the circuit court made its order permitting the defendant and his representatives to inspect, examine, and take copies of all records of the Rural Credit Board, the joint committee of the 1925 Legislature and the National Bank of Commerce of Pierre, S. D.; and allowing the defendant and his representatives access thereto at all reasonable times. On January 9, 1926, pursuant to the demand of the defendant, a bill of particulars was served upon him, consisting of a detailed audit of accountants who, subsequent to the removal of defendant as such treasurer, had examined and audited the books and records of said board and bank, and thereafter, upon the trial, testified in relation thereto. On the opening day of the trial, the court allowed the application of the defendant for the appointment of two expert accountants to be subpœnaed on his behalf; their compensation and expenses to be paid by the state.

The trial was begun on January 12, 1926, and lasted nearly five weeks. The record is very voluminous. Appellant relies upon 197 assignments of error and specifies five particulars of insufficiency of evidence. All of these assignments of error have been carefully examined. A review of all of them would serve no useful purpose, but a clear understanding of those which are hereinafter discussed necessitates a rather extended statement.

Pursuant to the amendment of section 1, art. 13, of our state Constitution, adopted at the general election in 1916, the Legislature, by the enactment of chapter 333, Laws 1917 (now sections 10150-10173, R. C. 1919), established a system of rural credits and provided for its management and control by the South Dakota Rural Credit Board consisting of the Governor and four members to be by him appointed, one of such members to be designated and known as treasurer of the South Dakota Rural Credit Board.

Section 10153, R. C. 1919, as amended by chapter 304, Laws of 1919, prescribes the duties of such board, and provides that it shall make a monthly statement of its business upon such form as may be required by the Executive Accountant, whose duty it is, under said section, to audit such statements and make written reports thereon which are required to be filed in his office as a permanent record and a copy forthwith transmitted to the Governor and to the secretary of the board.

Section 10157, R. C. 1919, prescribes as part of the duties of the treasurer of the board:

"To receive and keep safely the money of such board or of the state that may come into his possession" and "to render monthly statements to the board of the transactions of his office."

Section 10166, R. C. 1919, is as follows:

"It shall be the duty of the board, assisted by the executive accountant and superintendent of banks, to prescribe and maintain in the offices of such board such system of books, records, accounts, receipts, vouchers and documents required to separate and verify each transaction and forms for reports and statements required for the administration of the officers of the board or for the information of the public, as such board and assistants shall deem proper and necessary for the safe and convenient conduct of the business of the board."

By section 10154, the rural credit commissioner is made the chief executive officer of the board, and by section 10156 it is made the duty of the secretary to keep such books and records as are necessary or convenient for the conduct of the business of the board. The statute empowers the board to borrow money on the credit of the state, to be used in making farm loans, and provides that all notes and mortgages taken by such board for money loaned shall run to the state of South Dakota. During all the time appellant was treasurer of the Rural Credit Board, he was also president and managing officer of the National Bank of Commerce of Pierre, S. D., and kept a part of his records as such treasurer in such bank, but most of the books, records, and papers pertaining to his office as such treasurer were kept in the state capitol building, in the same room with, but separate from, the records of the Rural Credit Commissioner. Appellant was also one of the incorporators of the Union Trust Company, whose charter was granted in 1890 and expired in 1910. It does not appear that this corporation transacted any business whatever after the expiration of its charter. There was, however, in said National Bank of Commerce at all times from August, 1917, until the day the bank closed an account carried in the name of the Union Trust Company, which account was, during all of said time, under the exclusive control of appellant.

Upon its organization, the Rural Credit Board proceeded to borrow large sums of money upon the credit of the state of South Dakota, and all funds procured during his incumbency came into the hands of appellant, and he received as such treasurer the sum of $61,957,464.97. A large part of this amount was deposited in said National Bank of Commerce, and was therein credited to one of three different accounts denominated respectively, "Rural Credit Board, A. W. Ewert, Treasurer," "Rural Credit Board Collection Account," and "Union Trust Company." After being so deposited portions of such funds were, from time to time, by appellant transferred to other bank depositaries, and a portion was also deposited or transferred to a general collection account in said National Bank of Commerce known as the "Collection" account. All funds received by appellant as such treasurer were, by the accountants, traced to bank deposits, and for each month up to and including December, 1924, appellant filed reports, as required by section

10157, R. C. 1919, purporting to show, among other things, receipts and disbursements, and available funds and where the same were deposited. By the report for December, 1924, filed on January 13, 1925, appellant showed available funds of the board on hand amounting to $3,422,787.60, claimed to be on deposit in approximately 250 banks therein enumerated, including $739,727.99 in Corn Exchange Bank, New York City, $101,599.48 in Continental Trust & Savings Bank, Chicago, $103,679.24 in National Bank of Commerce at Pierre, and $33,257.30 in the collection account in National Bank of Commerce. None of these reports disclosed any deposits in the Union Trust Company account in said National Bank of Commerce.

The day following removal of appellant as treasurer of the Rural Credit Board, the National Bank of Commerce failed to open, and possession and control thereof were thereupon taken over by the Comptroller of the Currency. On the day the bank closed, Marion Heck, the assistant cashier, discovered that the transfer sheets of the ledger account of the Union Trust Company were missing from the file in which they had formerly been kept, and a thorough search for these conducted by the examiner in charge, the accountants, and others was fruitless, and their disappearance has not been accounted for. The current ledger sheet of this account, kept in the current ledger of said bank, which was properly identified and received in evidence, correctly reflects the amount of rural credit funds which were deposited in or withdrawn from the Union Trust Company account from September 17, 1924, to February 4, 1925, both inclusive.

J. S. Connell, one of the expert accountants who audited the books of the treasurer of the Rural Credit Board, and of the National Bank of Commerce, testified that, from records which were received in evidence, consisting of deposit slips, checks, and other documents, he and his assistants reconstructed and rebuilt the ledger account of the Union Trust Company. In other words, these accountants ascertained from documents of original entry, consisting of deposit slips, canceled checks, and other papers, what the missing ledger sheets should disclose as to the account. As a part of the bookkeeping system in vogue in the bank, there was each day made an adding machine list of all checks charged to individual depositors for that day; this list being made up after all

checks had been sorted alphabetically. All of these as well as all other books and records of the bank covering the period in question were received in evidence. From these, by a process of elimination and trial balances, the rebuilt account was made up and verified. For the period from August, 1917, to August 28, 1922, inclusive, a tabulated statement was prepared showing the deposits and withdrawals of rural credit funds only, and such deposits exceeded the withdrawals by the sum of $265,051.52, but there was, on August 28, 1922, a credit balance in said account of $161,397.30, indicating that prior to August 28, 1922, $103,654.22 of rural credit funds had been withdrawn from Union Trust Company account and appropriated to other than rural credit uses, but no evidence was introduced tending to show the exact time when nor the purposes for which these withdrawals were made.

A trial balance of the books of the bank was made as of August 28, 1922, and the correct balance in the account ascertained, and from date to February 4, 1925, the account as rebuilt shows the total deposits and withdrawals from the account, both of rural credit funds and other funds. This reconstructed or rebuilt ledger account was not received in evidence, but the accountants were permitted to testify to the items as disclosed by documentary evidence which had been received. The total deposits of rural credit funds traced into the Union Trust Company account for the entire period of appellant's incumbency is the sum of $26,477,830.35, and the total withdrawals of funds for rural credits purpose is $26,266,392.76, leaving a total of $211,437.59, being the amount set forth in the indictment, withdrawn from said account for other than rural credit purposes. As already stated, $103,654.22 of this amount was withdrawn prior to August 28, 1922. The witness Connell testified to the items making up the total of $107,783.37 withdrawn from the account for other than rural credit purposes between August 28, 1922, and February 4, 1925, and referred to exhibits showing such withdrawals. $25,200 was the total of amounts so withdrawn and credited direct to the personal account of appellant in the National Bank of Commerce. Many personal checks of appellant were, pursuant to his instructions, paid and carried in the bank as cash items and later charged to the Union Trust Company account, and these checks, together with other cash items so charged to this account, amounted to over $44,000.

$7,500 was used in payment of personal notes of appellant. $6,000 was withdrawn by appellant and loaned to a third party. Over $24,000 was used to pay notes of the National Bank of Commerce. It is unnecessary to enumerate all the items disclosed by the evidence.

On the day appellant was removed from office as such treasurer, the balance remaining in the Union Trust Company account was, at his direction, transferred to the Rural Credit Board account, and the Union Trust Company account was closed. The current ledger sheet hereinbefore referred to shows that the Union Trust Company account was overdrawn on October 31, 1924, to the extent of over $1,461. The undisputed testimony shows that no funds other than rural credit funds were thereafter deposited in that account and that on December 31, 1924, $9,000 was taken therefrom and credited direct to the personal account of A. W. Ewert in the National Bank of Commerce to take care of an overdraft of such personal account, in substantially the same amount.

Mr. Connell testified, and was corroborated by G. R. Gaskell, an expert accountant, who, on behalf of the Bureau of Investigation of the Department of Justice of the United States government made an investigation of the affairs of the bank and an audit of its books, that the total amount received by appellant as such treasurer as disclosed by the books in evidence was the sum of $61,957,-464.97, and that the total amount disbursed by him as such was the sum of $58, 681, 843.96, leaving the sum of $3,275,621.01 to be accounted for by him, and that the amount on hand or on deposit at the close of business, February 4, 1925, including $85,000 in the collection account of the National Bank of Commerce, was the sum of $3,064,183.42, leaving a general shortage of $211,437.59, the exact amount shown to have been withdrawn from rural credit funds in the Union Trust Company account in said bank for other than rural credit purposes. This is also the exact amount shown by the books of the Rural Credit Board to be the excess of the amount charged to appellant as treasurer over that found on deposit and on hand when he was removed from office, after the correction of a slight ascertained error in the treasurer's accounts.

The methods used by appellant to cover or secrete his shortage are simple, and clearly appear from the evidence. Each of the bank depositaries of rural credit funds throughout the period filed

reports shown by affidavits to be correct, with the Executive Accountant and with the treasurer of the Rural Credit Board showing funds of the board on deposit. From these reports appellant, as such treasurer, made out monthly reports in duplicate of which one was sent to the Governor and one to the Executive Accountant showing each month where the funds in the custody of the treasurer were claimed to be on deposit. This report, of course, corresponded to the several reports filed by the banks, as to amounts deposited in each thereof. It was the usual practice of appellant, during the last days of each month, to draw his checks as such treasurer in amounts sufficient for the purpose, upon a New York bank, payable to himself as treasurer, and to then deposit the same in the National Bank of Commerce to the credit of the Union Trust Company. These checks did not arrive at New York until after the first of the following month so that the withdrawal did not show on the report of the New York bank for the month during which it was made and during which it was credited to the Union Trust Company account. Appellant each month waited until the reports of the depositary banks had been filed, and apparently reconciled the total accounted for by the depositary banks with the amount with which he was charged, and reported whatever deficit there was as being on hand in the National Bank of Commerce, and transferred from the Union Trust Company account to the account of the Rural Credit Board the amount necessary to reconcile the account. Another method used by appellant to cover his shortage was by crediting to the account of the Union Trust Company warrants of the Rural Credit Board issued by him as treasurer for the purpose of paying interest on bonds, and then not disbursing the same until after the first of the following month. By these and other methods the accounts of the treasurer were made to appear correct, and the reports of the depositary banks made to show deposits in the amount with which appellant was chargeable. The appellant offered no testimony in his own behalf, and all of the matters hereinbefore recited were shown by evidence which is practically undisputed.

The assignments of error will be hereinafter discussed in groups in the order presented in appellant's brief.

Appellant complains of the overruling of his demurrer to the indictment, which he contends does not substantially conform to

the statute in that (a) the offense charged is not designated in such a manner as to enable a person of common understanding to know what is intended; (b) it does not allege the commission of an offense in the language by which any crime is usually designated; (c) it is not direct and certain as to the crime charged.

Appellant in his brief says:

"It was conceded upon the presentation of the demurrer and throughout the proceedings in this action that the state had relied upon this section of the statute (3814), and bases its indictment upon it, and the defendant was tried and sentenced for the offense described in this section."

We shall assume the truth of this statement. This section, in so far as the same is pertinent to this opinion, is as follows:

"Sec. 3814. *False Accounts by Officers.* Every public officer, and every deputy or clerk of any such officer, and every other person receiving any moneys on behalf of or on account of this state, or of any department of the government of this state, or of any bureau or fund created by law, and in which this state or the people thereof are directly or indirectly interested, who:

"Appropriates to his own use or to the use of any person not entitled thereto without authority of law, any money received by him as such officer, clerk or deputy, or otherwise, on behalf of this state, or the people thereof, or in which they are interested; or, * * * is guilty of a felony. * * *"

The indictment was entitled "Indictment for Embezzlement," which is defined by section 4226, R. C. 1919, to be the fraudulent appropriation of property by a person to whom it has been intrusted. Section 3814, R. C. 1919, does not in so many words provide that the offense therein described shall constitute embezzlement, but the offense therein described does come within the meaning of the word "embezzlement" as above defined and as understood by persons of common understanding, and appellant could not have been misled or prejudiced either by so designating the offense in the indictment or by so referreing to it throughout the trial.

Appellant contends that the indictment does not allege the offense defined by section 3814 in that (a) it is not alleged that the money was owned by or received on behalf or on account of the state or was money in which the state or the people thereof

are interested; (b) it does not aver that the money was appropriated without authority of law; (c) it does not negative the ownership of the funds by the accused; (d) it does not allege that accused is a public officer or that he was charged with any duty respecting the funds in question; (e) it does not allege that the money came into his hands by virtue of his office; and (f) it does not set forth the purpose for which accused was intrusted with the money.

These contentions are devoid of merit. The office of an indictment is to apprise the defendant of the crime of which he is accused, and, if it is entitled in a proper court, shows that it was returned by a duly authorized grand jury, names the defendant, and shows the commission of an offense within the jurisdiction of the court prior to the time of the filing of the same, and the offense charged is designated in such manner as to enable a person of common understanding to know what is intended, it is sufficient. Section 4725, R. C. 1919.

Words used in a statute to describe a public offense need not be strictly pursued in the indictment, although this is the practice to be recommended, but other words conveying the same meaning may be used. Section 4724, R. C. 1919.

Matters of which judicial notice is taken need not be stated. Section 4727, R. C. 1919.

Section 4726, R. C. 1919, is as follows:

"Sec. 4726. *Certain Informalities Disregarded.* No indictment or information is insufficient, nor can the trial, judgment or other proceedings thereon be affected, by reason of a defect or imperfection in matter of form, which does not tend to the prejudice of the substantial rights of the defendant upon the merits."

██ Judicial notice is taken that the Rural Credit Board is a bureau of the state of South Dakota, that the treasurer of such board is a public officer charged with the duties imposed upon him by law, and that the state is interested in the funds coming into his hands as such, and the purpose for which such funds are intrusted to him. The averment that the appropriation of these funds was made "willfully, fraudulently and feloniously," is tantamount to an allegation that the same was "without authority of law" and without the consent of the owner. The allegation that "said money was then and there the property of said South Dakota

Rural Credit Board" and "had * * * been received and collected by said Adolph W. Ewert as treasurer of said * * * board" sufficiently sets up ownership of the fund in said board and that the same came into his hands by virtue of his office, and sufficiently negatives ownership thereof by accused. All of these matters are too obvious to warrant further discussion or the citation of authorities. The practice of making groundless and hypercritical objections to informations and indictments should not be encouraged. We have adopted a more rational system of pleading in criminal cases than that formerly in vogue, by which it is hoped that the wheels of justice may be accelerated without the denial, to those charged with crime, of any substantial right. Where an indictment or information contains all essential averments, no defect or imperfection in matter of form which does not prejudice the substantial rights of the accused will be considered as material.

██ In his opening statement upon the trial, counsel for the state stated to the jury that the evidence would show a shortage in the accounts of appellant in the sum of $211,437.59. He then detailed to the jury that the state expected to prove that a total of $107,783.37 was converted between August 28, 1922, and February 4, 1925, and that the amount unlawfully appropriated prior to August 28, 1922, was $103, 654.22. He detailed about thirty separate misappropriations from the same fund and through the Union Trust Company account in the National Bank of Commerce and the purposes for which such funds would be shown to have been misappropriated, including an item of $6,000 loaned to one Quackenbush, $24,345.28 for the payment to the National Bank of Commerce of notes of certain individuals, and other items appropriated for different purposes. He also stated that the state would show that after February 5, 1925, a written demand was served upon accused that he account for his shortage, and that he failed to do so. After the completion of this statement, and prior to the introduction of any evidence, defendant moved that the state be required to elect on which of the alleged independent and distinct appropriations or acts of embezzlement it would rely, or whether it would rely upon a general shortage, and that, if the state elected to proceed on the independent acts of alleged conversion, it be required to elect upon which thereof it would rely and proceed. The denial of this motion is the basis of the second

assignment of error. Appellant contends that, inasmuch as it appeared from the opening statement that more than $103,000 was claimed to have been misappropriated more than three years prior to the filing of the indictment, proof thereof should not have been allowed, and claims that the error in failing to require an election and the prejudice suffered by the accused are fully disclosed by the fact that evidence of the separate misappropriations was received, and the court instructed the jury in relation thereto as follows:

"In order to warrant you in finding the defendant guilty, it is not necessary that the evidence proves the appropriation of the entire sum charged in the indictment. If you are satisfied beyond a reasonable doubt that at any time on February 4, 1925, or prior thereto within three years prior to the filing of the indictment, as aforesaid, the defendant, without authority of law, appropriated and converted to his own use any sum of money whatsoever in his possession belonging to the Rural Credit Board * * * you would be justified in bringing in a verdict finding the defendant guilty."

Appellant further says:

"The fact that the court so pronounced the law to the jury makes it apparent that the jury might have found the defendant guilty of embezzling either the sum as alleged in the indictment, or any specific item described as separate and distinct appropriations in the opening statement; and, further, under such proceedings, the verdict might have been arrived at by the jury for the reason that each of the different members was convinced, beyond a reasonable doubt, as to the appropriation of separate items when they were not in fact in accord as to any one item thereof."

We find, however, in the instructions as given by the court, the following:

"(16) There is one matter which I desire to call to your especial attention. You cannot find the defendant guilty of any act, transaction, or fact, which in your opinion, or in the opinion of any of you, might show defendant's guilt, unless every one of your number is satisfied beyond a reasonable doubt that such transaction, act, or fact, is proved by the evidence. Suppose, for instance, that some of your number were satisfied that a certain transaction was proved and constituted embezzlement, and some of you were not so satisfied, but were satisfied that some other transaction had

been proved which constitutes embezzlement, but that all believed him to be guilty of embezzlement, but based your conclusions on entirely different transactions, you can see that such verdict would not be unanimous. In order to warrant you in returning a verdict of guilty, your verdict must rest upon transactions of which you are all satisfied beyond a reasonable doubt."

. We assume that the jury understood and was guided by this instruction, and that they agreed upon one or more of the items proved. In support of his contention that an election should have been required, appellant cites Ex parte Ricord, 11 Nev. 287; State v. Berg, 200 Iowa, 627, 204 N. W. 441, and Commonwealth v. Stites, 190 Ky. 402, 227 S. W. 574. None of these support such contention. Ex parte Ricord, supra, is a proceeding upon habeas corpus. Defendant had been tried and acquitted on a charge of embezzlement, and was being held for another embezzlement. It was stipulated that upon the first trial the prosecution first introduced proof to show embezzlement of certain money and offered to introduce further proof concerning other sums, to which the objection of the accused was sustained. On the habeas corpus hearing, accused contended that his said objection was erroneously sustained, and that he had been guilty of but one embezzlement. The court held that he may have committed more than one embezzlement, but that he had not sustained the burden which was upon him to show the identity of the offenses, and remanded him. In State v. Berg, supra, the prosecution was for an alleged violation of a statute under which a failure to account as well as a wrongful conversion constituted an essential element of the offense. The defendant was charged with the embezzlement of an aggregate amount of fees which, under the statute, he was required to pay over each month. The court says:

"We are of the opinion that, where the evidence tended to show a wrongful conversion of the fees on or after their collection, of which the failure to enter them upon the books and to pay them to the city treasurer, as by statute required, was competent evidence, that evidence tending to show a failure on demand to pay over the aggregate amount unpaid was required to warrant the submission of the cause to the jury upon the charge of the embezzlement of the total amount unpaid. In such case, no election would have been required." 200 Iowa, 635, 204 N. W. 445.

Commonwealth v. Stites was a prosecution for incest, and has no application.

 The great weight of authority sustains the view that no election is necessary under circumstances such as are disclosed in this case. The crime of embezzlement is peculiar in some respects, and usually consists of a series of acts of conversion, done at various times, and resulting in the principal and important fact of a shortage. Where the embezzlement or misappropriation of an aggregate amount is charged, proof of the embezzlement of any part of the sum alleged is sufficient. Underhill's Criminal Evidence (3d Ed.) § 453; State v. Bickford, 28 N. D. 36, 147 N. W. 407, Ann. Cas. 1916D, 140. Under our practice it is unnecessary to state the exact time the misappropriation occurred. Section 4721, R. C. 1919. The offense, as disclosed by the opening statement and the proof thereafter adduced, consisted of a succession or continuation of acts culminating in the shortage alleged. It was proper for the state, under the general allegation of the misappropriation of the aggregate amount, to detail to the jury and prove all the separate acts constituting the entire continuing offense. Evidence alone of such transactions as were barred by the statute of limitations would not support a conviction, but were admissible as evidence of the misappropriation not so barred. 16 C. J. 596; Mangham v. State, 11 Ga. App. 427, 75 S. E. 512. There was no error in denying the motion to require the state to elect. We cite only a few of the authorities supporting these views. Ker v. People, 110 Ill. 627, 51 Am. Rep. 706; State v. Reinhart, 26 Or. 466, 38 P. 822; Griswold v. State, 23 Okl. Cr. 136, 212 P. 1018; State v. Gibson, 37 Utah, 330, 180 P. 349; State. v. Dawe, 31 Idaho, 796, 177 P. 393; State v. Noland, 111 Mo. 473, 19 S. W. 715; State v. Pratt, 98 Mo. 482, 11 S. W. 977; Chamberlain v. State, 80 Neb. 812, 115 N. W. 555.

 Appellant also contends that an election should have been required because the opening statement showed that a part of the funds were for the use of the bank and other individuals. As was said in State v. Pratt, 114 Kan. 660, 220 P. 505, 34 A. L. R. 189:

"The money was applied to the use of appellant when he used it in the way he wanted to use it, whether he chose to use it on his personal obligations or give it to the bank of which he was presi-

dent, or spend it in riotous living, he directed its disposition and thereby applied it to his own use."

▇▇▇ Appellant assigns as error the receipt in evidence of Exhibits 49 and 50. These were not received in evidence as a whole. The only part of Exhibit 49 which reached the jury is as follows:

"Hon. A. W. Ewert, Pierre, South Dakota—Dear Sir: You will please take notice that you are hereby removed as a member of and as treasurer of the South Dakota Rural Credit Board.

"Respectfully,

"Carl Gunderson, Governor."

And the only part of Exhibit 50 submitted for the consideration of the jury is as follows:

"State of South Dakota to Adolph W. Ewert, also named A. W. Ewert, as Ex-Treasurer of South Dakota Rural Credit Board:

"The undersigned officers of South Dakota Rural Credit Board do hereby demand of you to pay forthwith all public moneys that came into your possession as treasurer of South Dakota Rural Credit Board, to A. C. Bernau, the appointed and qualified treasurer of South Dakota Rural Credit Board. May 20, 1925. Carl Gunderson, Governor, ex officio President of South. Dakota Rural Credit Board. A. C. Bernau, Treasurer of South Dakota Rural Credit Board."

▇▇▇ Appellant contends that it was unnecessary under the indictment to prove any demand or refusal to pay over the funds. If the correctness of this assertion be assumed, there was no error in receiving Exhibit 49 to show the removal of appellant from the office of treasurer of the Rural Credit Board, and proof of the demand for the funds was proper if unnecessary. The general rule is that evidence of demand for a return of money and its refusal by the defendant is admissible and competent for the purpose of showing conversion. State v. Moyer, 58 W. Va. 146, 52 S. E. 30, 6 Ann Cas. 344; Commonwealth v. Kelley, 125 Ky. 245, 101 S. W. 315, 15 Ann. Cas. 757; People v. Ward, 134 Cal. 301, 66 P. 372; Underhill Criminal Evidence (3d Ed.) § 488.

Our attention has been called to no contrary holding. Appellant also contends that the demand was insufficient, but, if none was required, as contended by appellant, then certainly he could

not be prejudiced by any insufficiency either in the notice itself or the manner in which or time when it was served.

 Appellant in his argument has grouped the assignments relating to the admission in evidence of the books, records, papers, receipts, vouchers, and files of the Rural Credit Board. These documents were received over the objection of appellant, together with the books, records, and papers of the National Bank of Commerce, which were offered by the state for the purpose of laying a foundation and as a foundation for the testimony of accountants, and for inspection and cross-examination purposes, as was stated by counsel for the state at the time of the offer. It cannot be assumed that the jury made any extended examination of the thousands upon thousands of documents under discussion. The objection to them was based largely upon a lack of proper foundation or authentification, and that the same were hearsay. The appellant complains that he was not confronted by the witnesses who made all the entries in the books, that there was no showing that the books were correctly kept, and also that some of the books and records related to transactions barred by the statute of limitations. As we have already observed, it was by statute made the duty of the treasurer of the board to keep books and records and make reports. It appears from the evidence that this was done, and the records so kept were those received in evidence. It appears that they were regularly kept.

Appellant has not pointed out any particular in which a proper foundation was not laid for any of these documents, which were prejudicial to him. He has not, by his assignments of error, nor in his argument, indicated where the foundation for any particular exhibit was laid, and, though he has asserted error in this particular, he has not pointed out any which he has shown to be prejudicial. He particularly complains of the admission of exhibits which constitute the basis of the seventh assignment, being Exhibits 221 to 378, inclusive, and 385-387, inclusive. The assignment relates to a great mass of documents; the assignment itself covering twenty typewritten pages. It refers to pages in the brief where we find a record of the receipt in evidence of the documents, but the testimony offered as a foundation for the receipt of these exhibits is not found accompanying the offers. Our attention is not called to the part of the brief where such foundation may be found, nor

does appellant set out enough of the exhibits to point out that they were prejudicial even if improperly received. Exhibits 221 to 267, inclusive, were triplicate receipt books of the treasurer of the Rural Credit Board, and we find from a search of the record that these were properly identified by Isadore Wellington, who testified that she had been employed by appellant since 1921; that she kept the books in the office of the treasurer of the Rural Credit Board under the supervision of Mr. Ewert, the appellant; that she wrote many of the receipts of which these books contained about 44,000; that the receipts were accurately kept and entered in these books; that the books were kept in the regular course of business of the treasurer; but that receipt No. 9159 was the first one in her handwriting. Exhibits 368 to 370 are partial payment receipt books, and, by a search of the brief, unassisted by anything either in the assignment or argument, we find that these books were properly identified. We find no description either in the brief or record of Exhibits 371 and 372. The witness Wellington testified that Exhibits 373, 374, and 375 are books of duplicate debit slips. Exhibits 376 to 378 are general receipt records, many of which are signed by appellant and the remainder by others in his office. Exhibit 385 was withdrawn and is not in evidence. Exhibits 387 to 390 were identified by Miss Wellington as records and files of the treasurer's office, known as the remittance books. Exhibit 391 was identified by Miss Wellington, and we find that Miss Minnie Cooper, who was shown by Miss Wellington to have made the entries therein, also appeared as a witness and testified that she was employed by appellant from December 17, 1920, and remained in the treasurer's office up to the time of the trial. She identified the book and the entries therein and also identified Exhibit 394 as a record of the office kept by her, being a register of certificates of deposit on hand during the period covered by the book. Miss Wellington identified Exhibits 392 to 395 as receipt books and Exhibits 396 and 397 as journal records of partial payments. She identified Exhibit 398 as a record of vouchers paid for a period from 1917 to 1923, but that a part of the entries were prior to her going into the office. Exhibit 399 is substantially the same as 398, except for a later period.

It would be useless to pursue this discussion further. We have called attention to these few exhibits to show the general

state of the record. In every instance where we have searched for and found the foundation for any exhibit we have found it sufficient, or that the showing as to the contents of the exhibit was insufficient to show that its receipt in evidence was prejudicial. Appellant in his brief refers to letters, memoranda, and miscellaneous papers, received in evidence without foundation, but fails to call our attention to the foundation which was laid, and fails to show sufficient of the contents of these to show any prejudice, and has thus failed to point out wherein any alleged error was prejudicial as required by rule 4, Supreme Court Rules. As to the records of the board, it may be observed that these were required by law to be kept; sections 2726 and 2727, R. C. 1919, provide as follows:

"*Official Records.* Entries in public or other official books or records, made in the performance of his duty by a public officer of this state, or by another person in the performance of a duty specially enjoined by law, are prima facie evidence of the facts stated therein."

"*Same.* An entry made by an officer or board of officers, or under the direction and in the presence of either, in the course of official duty, is prima facie evidence of the facts stated in such entry."

It will be noted that these sections merely make the entries prima facie evidence of the facts stated; the weight to be given them, if their truth is questioned, is for the jury. In State v. Hall, 16 S. D. 6, 91 N. W. 325, 65 L. R. A. 151, in which the appellant Hall was convicted of murder, Judge Corson says:

"The alleged error is that the court erred in admitting these books in evidence, for the reason that it was not shown that they were required to be kept by law, and there was no proof of any regulation of the post office department requiring such books to be kept. It is contended on the part of the state that being books kept by the postmaster, and being found in the post office, they were admissible upon proof of these facts. The books were introduced in evidence for the purpose of showing that a certain money order issued by the post office at Hartford, in this state, was cashed at the Tarkio post office. The entries in that book were not made by the witness, but the testimony shows that it was

one of the records in that office, and had been in the office while the witness had been a clerk there, and that they were in the custody of the postmaster, and were a part of the records of the office which had been used and kept by a former postmaster, and was delivered to the witness by the present postmaster to bring to the trial; and that a similar record was kept by the present postmaster. We are of the opinion that the objections of the counsel for the accused are not tenable. It is quite clear from the testimony of the witness that the books offered in evidence were records of transactions made in the office of the postmaster at Tarkio, necessary and proper in the orderly conduct of the business of that office. In other words, they seem to have been official registers or records kept by a person in a public office, in which they were required either by statute or by the nature of his office."

In Jones, Commentaries on Evidence (2d Ed.) § 1700, the rule is thus stated:

"When persons in public office are required by statute or by the nature of their office to write down particular transactions occurring in the course of their public duties and under their personal observation, such records are usually admissible as substantive evidence. When such entries are made by authorized public agents in the course of public duty, and relate to matters in which the whole public may be interested, the circumstances are deemed sufficient sanctions to dispense with the necessity of an oath and cross-examination."

Whenever a written record of the transactions of a public officer in his office is a convenient and appropriate mode of discharging the duties of the office, and is kept by him as such, whether required by express provision of law or not, such a record is a public record, and as such is admissible in evidence. 10 R. C. L. 1126; Dikeman v. Parrish, 6. Pa. 210, 47 Am. Dec. 455.

In Chesapeake & Delaware Canal Co. v. United States (C. C. A.) 240 F. 903, the court said:

"We understand the general rule to be that when a public officer is required, either by statute or by the nature of his duty, to keep records of transactions occurring in the course of his public service, the records thus made, either by the officer himself or under his supervision, are ordinarily admissible, although the en-

tries have not been testified to by the person who actually made them, and although he has theretofore not been offered for cross-examination."

See, also, Woodruff v. State, 61 Ark. 157, 32 S. W. 102; Griswold v. State, 23 Okl. Cr. 136, 212 P. 1018; People v. Love, 310 Ill. 558, 142 N. E. 204; People v. Rose, 207 Ill. 352, 69 N. E. 762; U. S. v. Swan, 7 N. M. 309, 34 P. 533; Commonwealth v. Slavski, 245 Mass. 405, 140 N. E. 465; State v. Dowdy, 145 N. C. 432, 58 S. E. 1002.

The next group of assignments discussed, being Nos. 43 to 81, inclusive, and 107 to 173, relate to the admission in evidence of the records, papers, and files of the National Bank of Commerce. As we have already observed, appellant was the president and managing officer of this bank during all the time material to the inquiry. The books had been audited by Mr. Connell and Mr. Gaskell, and were offered as a foundation for their testimony. Practically every employee of the bank during the period appeared as a witness. Ample foundation was laid for these records. No attempt was made on cross-examination or otherwise to impeach or discredit the proof offered by the state in any substantial detail. Appellant relies on the case of State v. Magnuson, 48 S. D. 112, 202 N. W. 638. In that case the alleged error of the trial court was the exclusion of certain bank records because no proper foundation had been laid therefor, in that the witness who prepared a certain deposit slip was not called or his absence in any manner accounted for. It did not appear that the defendant could not easily have complied with the requirement of the trial court that such witness be called. We held that there was no error in excluding the exhibit. We said:

"The foundation required for the admission of testimony, even though it be competent, is largely within the discretion of the trial court."

We did not hold that it would have been error to have admitted the document.

To the effect that what is a sufficient proof of the verity of books is a question largely confided to the discretion of the trial court, see 10 R. C. L. 1174; Seaboard Air Line Railway

v. Railroad Commissioners, 86 S. C. 91, 67 S. E. 1069, 13 Am. St.
Rep. 1028.

 In the present case, it was deemed necessary for the
state to offer practically all the books, records, deposit slips, files,
and papers of the National Bank of Commerce. Weeks were spent
in laying the foundation for these documents. The learned trial
judge proceeded with the utmost care and discernment in ruling
upon the admission of these records, and, if any errors were made
in their admission, the particulars wherein they were prejudicial to
the appellant has not been pointed out. They were the books of
the bank of which appellant was president and managing officer;
he was familiar with them, and he necessarily relied on them. The
ledger account of the Union Trust Company, through the instru-
mentality of which he was enabled to make and conceal the mis-
appropriation charged, was, with the exception of the current
sheet, missing from the records of the bank. Under the circum-
stances, the extent of the foundation to be required was largely
within the discretion of the trial court, and we do not find that he
abused that discretion. We approve of the following language
used by the Supreme Court of Montana in State v. Cassill, 70
Mont. 433, 227 P. 49:

"Over defendant's objection the court admitted in evidence
sheets from the original ledger kept by the Iowa bank, showing
its account with the Ovando bank during a portion of the period
of time inquired about. This is assigned as error. It is urged
that Mr. Montgomery who identified the ledger sheets and who
was permitted to testify as to their correctness was not competent
to do so because he did not make the entries himself and did not
have actual personal knowledge of them. It is not questioned that
the sheets admitted in evidence were what they purported to be—
a portion of the ledger of the Iowa bank. In view of the system
of bookkeeping employed they were practically sheets of original
entry. The books were kept in the ordinary course of business,
and the entries were made contemporaneously with the transactions
of which they spoke. Were the books kept correctly?

"The Iowa bank was a modern institution. Besides the presi-
dent, vice president, and cashier, there were assistant cashiers,
bookkeepers, clerks, and stenographers. The actual entries shown

upon the ledger sheets were made by the bookkeepers, but if the bookkeepers were on the stand they could only testify that the entries made by them were made correctly from data furnished them by others in the due course of business. Who, then, should have been produced to verify this ledger? Everybody who had anything to do with these entries? That requirement frequently would make impossible the use of books of any large commercial or industrial concern. A sufficient answer in such case should be that, if the trial court is satisfied from the testimony of a supervising officer that the books offered in evidence are those of regular entry correctly kept in the ordinary course of business they should be admitted. The excellence and thoroughness of modern bookkeeping methods in banks, large mercantile establishments, and business concerns generally are well known. This method of proving the books is in accordance with modern business requirements and we think, when a proper foundation for its application is laid, it affords a factor of safety quite equal to that recognized in Ryan v. Dunphy, 4 Mont. 356, 5 P. 324, 47 Am. Rep. 355, and Meredith v. Roman, 49 Mont. 204, 141 P. 643 [L. R. A. 1915B, 988, Ann. Cas. 1916A, 1166]. The rule stated in those cases is still applicable to facts similar to those therein presented. As observed by Mr. Wigmore, 'courts must cease to be pedantic, and endeavor to be practical.' In volume 3 of his work on Evidence, § 1530, he recognizes the rule above stated as follows: 'In such a case it should be sufficient if the books were verified on the stand by a supervising officer who knew them to be the books of regular entries kept in that establishment; thus the production on the stand of a regiment of bookkeepers, salesmen, shipping clerks, teamsters, foremen, or other subordinate employees, should be dispensed with.' "

See, also, Smith v. Sullivan, 58 Mont. 77, 190 P. 288; Continental National Bank v. First National Bank, 108 Tenn. 374, 68 S. W. 497; People v. Maljan, 34 Cal. App. 384, 167 P. 547; State v. Brassfield, 33 Idaho, 660, 197 P. 559; State v. Wolkow, 110 Kan. 722, 205 P. 639, 42 A. L. R. 265; People v. Larson, 225 Mich. 355, 196 N. W. 412; Bettman v. U. S. (C. C. A.) 224 F. 832; State v. McCauley, 17 Wash. 88, 49 P. 221, 51 P. 382; State v. Reinhart, 26 Or. 466, 38 P. 822; Spence v. State, 20 Ga. App. 61, 92 S. E. 555; 2 Wigmore on Evidence, § 1557.

 Appellant complains that various witnesses were permitted to give oral testimony of their conclusions relative to exhibits. About seventy assignments relate to this class of testimony. These objections were aimed largely at the testimony of the expert accountants, who were permitted to state the conclusions reached by them as to the state of certain books of account, and generally as to result of the audit made by them. These accountants were allowed to testify as to computations made by them from the documents which had previously been identified and received in evidence. These computations included the amount disbursed by appellant as treasurer and the balance to be accounted for, also the balance on hand and on deposit as disclosed by the documents in evidence, and a great mass of other matters, all shown by the testimony to be based upon the books, documents, and papers received in evidence. We do not find that any such testimony was erroneusly received. It was offered in explanation of the exhibits and not to invade the province of the jury. Without these explanations, the exhibits would have been unintelligible to the jury. This is the accepted method of proving the contents of voluminous records and the result of audits thereof. The rule is thus stated in Wigmore on Evidence (2d Ed.) § 1230:

"Where a fact could be ascertained only by the inspection of a large number of documents, made up of very numerous detailed statements—as, the net balance resulting from a year's vouchers of a treasurer or a year's accounts in a bank ledger—it is obvious that it would often be practically out of the question to apply the present principle by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result."

In Jones, Commentaries on Eidenve, § 206, we find the following language:

"Where the originals consist of numerous documents which cannot be conveniently examined in court, and the fact to be proved is the general result of an examination of the whole collection, evidence may be given as to such result by any person who has examined the documents, and who is skilled in such matters,

provided the result is capable of being ascertained by calculation. This has been permitted when another course would cause great loss of time and tend to confuse the jury; and competent witnesses have been allowed to summarize the accounts and to state conclusions as to balances, and the like."

In Hollingsworth v. State, 111 Ind. 289, 296, 12 N. E. 490, at page 494, the court said:

"But one question remains. Two expert accountants, who had made an examination of the books, records, papers, and files of the treasurer's office, covering the time appellant was treasurer, were allowed to testify and to state the totals of the amounts received and paid out by appellant as such treasurer, as shown by such books and records. It is conceded by appellant's counsel, that in civil actions where, as here, the books, records, papers, and entries are voluminous and multifarious, and of such a character as to render it difficult for the jury to arrive at a correct conclusion as to amounts, expert accountants may be allowed to examine such books, etc., and to give to the jury the result of their examination and investigation. Some doubt is intimated as to whether or not such testimony should be allowed in criminal prosecutions, and it is said that, if allowed at all in such cases, it should be with the greatest caution. There should be caution in all cases, but we think of no principle which would admit such testimony in civil cases and exclude it in criminal prosecutions.

"The main objections urged to the testimony in the brief in behalf of appellant are that the books, records, and papers, from which the accountants got the data upon which they computed the amounts stated by them, were not sufficiently identified, and were not such as the law required shall be kept. We have examined the evidence, and have no hesitancy in holding that the identification was sufficient, in the absence of any countervailing testimony on the part of appellant. The statement of counsel that the books, etc., examined by the accountants were not such as the law requires to be kept, unsupported as it is by the citation of any authorities, or any attempt at argument, does not require that this opinion should be extended to specify in detail the books, etc., so examined. It is sufficient, in answer to that statement, to say that, in our judgment, the books, etc., so examined were the proper sources

from which to derive the data upon which to compute the amounts received and paid out by appellant."

See, also, Underhill, Criminal Evidence (3d Ed.) § 98; 22 C. J. § 1003; Masonic Mutual Benefit Society v. Lackland, 97 Mo. 137, 10 S. W. 895, 10 Am. St. Rep. 298; State v. Findley, 101 Mo. 217, 14 S. W. 185; State v. Reinhart, 26 Or. 466, 38 P. 822; Le Master v. People, 54 Colo. 416, 131 P. 269; People v. Gerold, 265 Ill. 448, 107 N. E. 165, Ann. Cas. 1916A, 636; People v. Munday, 280 Ill. 32, 117 N. E. 286, at page 296; Ruth v. State, 140 Wis. 373, 122 N. W. 733; State v. O'Neil, 24 Idaho, 582, 135 P. 60; State v. Brady, 100 Iowa, 191, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560; Bauer v. State, 99 Neb. 747, 157 N. W. 968; People v. Sawhill, 299 Ill. 393, 132 N. E. 477; People v. Doble (Cal. App.) 257 P. 81; Carrey v. Haun, 111 Or. 586, 227 P. 315; Cecil v. Montgomery, 95 Okl. 184, 218 P. 311; Bissett v. Bryant Lbr. Co., 156 N. C. 162, 72 S. E. 205, Ann. Cas. 1912D, 1353, and note.

■ Another group of assignments relates to the receipt in evidence of the testimony of A. C. Bernau, as to the amount which came into his hands as successor of appellant as treasurer of the Rural Credit Board. As we have already noted, the funds were in about 250 different banks in South Dakota and Eastern cities, and appellant strenuously contends that there was no competent proof of the amount on hand on February 4, 1925. Prior to the giving of this testimony by Mr. Bernau, Mr. Connell testified from his audit as to this amount, and there is no question as to the correctness of the figures so far as the record discloses. The trial court received in evidence bank statements from the bank depositaries which Mr. Connell testified had been used by the accountants as a verification of their computations. It was the apparent contention of appellant that the only proper manner of showing the amount in these depositaries would have been to produce witnesses from all of said banks to testify to the fact. At the close of the state's case, the court struck out the bank statements, and appellant contends that the testimony as to the balance on hand on February 4, 1925, was thus left unsupported by any competent documentary evidence.

On pages 2191 and 2192 of the record we find this testimony

of the witness Connell, given after stating that, in determining the amount of funds on February 4, 1925, he started with the treasurer's report for December 31, 1924:

"We built up a record of each deposit and withdrawal for every bank account in the month, verifying the entries included in the record as we went along and balancing the books at the end of the month.

"Q. How did you determine in your audit the amount of cash on deposit in open banks? A. By tracing the source of all deposits and disposition of all withdrawals, arriving at the balance in that manner as of February 4, 1925.

"Q. And how did you determine those for closed banks? A. In the same manner.

"Q. Did you, in making this determination, use the so-called pink bank statements in basing any of your conclusions as to the amount on deposit in closed or open banks as of February 4, 1925? A. No, sir.

"Q. Did you verify your calculations, proving your calculations by those pink sheets? A. Yes, sir."

As to certificates of deposit, the witness testified that the amount was determined by proving the source of certificates purchased and the disposition of certificates sold and paid, and that such calculation could be made without reference to the certificates themselves. This testimony is uncontroverted. Mr. Bernau testified as to the amount which he received, basing his testimony on the best and only means of knowledge available. It agreed as to the amount, with the testimony of Connell, based upon his audit and computation. The appellant was not prejudiced by the receipt of this testimony, nor by the denial of his motion to strike the same, nor by the action of the court in striking out the bank statements at the close of the state's case.

Assignments relating to alleged misconduct of counsel have been carefully considered, but do not merit discussion.

The assignment relating to instructions to the jury is not discussed in appellant's argument, but we have examined the same and find no error.

Lastly, appellant alleges insufficiency of the evidence to sustain the verdict, and particularly claims that the evidence discloses that the appellant paid out and expended for rural credit purposes, during the three years next preceding the filing of the indictment, $53, 613. 93 in excess of the amount of rural credit funds received by him during that period. Appellant asserts that this conclusion is as certain as mathematics can make it. With this we cannot agree. It is true that the witness Connell testified that, for the period from August, 1917, to August 28, 1922, the excess of deposits over withdrawals of rural credit funds in the Union Trust Company account was the sum of $265,051.52, but the testimony of the witness as clearly showed a credit balance in the account as of August 28, 1922, of $161,397.30, indicating, as we have heretofore noted, a misappropriation of $103,654.22 prior to August 28, 1922. In the argument advanced by appellant's counsel, this balance of $161,397.30 is left out of the consideration. It is not contended that all of the rural credit funds deposited in the Union Trust Company account were embezzled, but only that part thereof which was taken therefrom for other than rural credit purposes. It is true that the evidence shows that $53,613.93 more of rural credit funds were paid out from the Union Trust Company account for rural credit purposes after August 28, 1922, than was deposited therein, but the balance of $161,397.30 of rural credit funds was in the hands of the treasurer in the Union Trust Company account on that date, and it was thereafter that the misappropriation of an equal amount to that sum, less $53,613.93 properly expended, was made. The uncontroverted testimony shows that subsequent to that date $107,783.37 was misappropriated by appellant. Not only did the accountants ascertain the total amount of this shortage, but traced the transactions and the disposition of nearly all of the entire amount appropriated. Even if the testimony of the accountants be eliminated from consideration, the proof is ample to sustain the verdict. This is particularly true of the item of $9,000 misappropriated on December 31, 1924, hereinbefore detailed. But the testimony of the accountants was properly received, and discloses a misappropriation of the full amount stated in the indictment, and that a large, if not the major, part of it was so misappropriated within three years prior to the filing of the indictment. This discussion should not be extended further.

Finding no prejudicial error in the record, the judgment and order appealed from are affirmed.

KNIGHT, Circuit Judge, sitting in lieu of SHERWOOD, J., disqualified and not sitting.

MISER, C., sitting in lieu of POLLEY, J., disqualified and not sitting, concurs.

BURCH, P. J., and CAMPBELL, and BROWN, JJ., concur.